Edward COWARD, Appellant,

v.

ADT SECURITY SYSTEMS, INC., Appellee.

No. 98–7230.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 6, 1999.

Decided Nov. 12, 1999.

H. Vincent McKnight, Jr., argued the cause and filed the briefs for appellant.

Max H. Lauten argued the cause and filed the brief for appellee.

Before: EDWARDS, Chief Judge, WALD and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

Opinion filed by Circuit Judge STEPHEN F. WILLIAMS concurring in part and dissenting in part.

HARRY T. EDWARDS, Chief Judge:

Appellant, Edward Coward, alleges that, in violation of 42 U.S.C. § 1981 (1994), his employer, ADT Security Systems, Inc. ("ADT"), intentionally discriminated against him by paying him less than similarly situated white employees who hold the same job titles. The District Court,

however, found Mr. Coward's allegations baseless. As a result, it granted ADT's motion for summary judgment.

This marks the second time that the District Court has granted summary judgment in ADT's favor. When the case was first heard, the District Court ruled that Mr. Coward had failed to make out a *prima facie* case of discrimination. *See Boling v. ADT Sec. Sys.*, No. 95–2062, 1997 WL 198111 (D.D.C. Apr.11, 1997). On appeal, this judgment was reversed, and the case was remanded to the District Court for further proceedings. *See Coward v. ADT Sec. Sys.*, 140 F.3d 271 (D.C.Cir.1998) ("*Coward I*").

On remand, the District Court recognized that there was no longer a question as to whether Mr. Coward had met the burden of establishing a *prima facie* case. *See Coward v. ADT Sec. Sys.*, Civ. Act. No. 95–2062, Mem. Op. at 3, 7 (D.D.C. Nov. 18, 1998), *reprinted in* Joint Appendix ("J.A.") 142,204, 142,208. The District Court also recognized that there were at least three genuine issues of fact before it: whether similarly situated white employees were better compensated than the plaintiff; whether the plaintiff's salary grade reflected wage discrimination; and whether the plaintiff was still in fact working as a Telecommunications Network Facilities Manager ("TNFM") even after being reclassified to a lower position title. *See id.* at 3, *reprinted in* J.A. 142,204. However, the District Court noted that the decision in *Coward I* referred only to "genuine issues of fact, not genuine issues of *material* fact." *Id.* at 4, *reprinted in* J.A. 142,205. Thus, the District Court assumed that the "materiality" of these factual issues remained to be determined. The District Court also was convinced that the judgment of the Court of Appeals did not compel a jury trial; this made sense, because the decision in *Coward I* merely directed the trial court to complete the summary judgment inquiry prescribed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to determine whether ADT could proffer a nondiscriminatory reason for Mr. Coward's lower salary and grade, and whether Mr. Coward could rebut such a proffer. *See Coward I*, 140 F.3d at 276.

After reviewing the evidence before it, the District Court concluded that Mr. Coward had failed to show that his duties were comparable to those of other TNFMs and that there was no evidence to indicate that the reduction in his job grade was motivated by race. *See* Mem. Op. at 9, *reprinted in* J.A. 142,210. In short, the District Court held that "the plaintiff failed to introduce any evidence or even argue any rationale for finding the defendant's reasons merely a pretext for discrimination." *Id.*

On appeal, Mr. Coward again asserts that the trial judge has usurped the jury's fact-finding function in resolving material issues of fact. Mr. Coward's most compelling argument is that ADT failed to offer a reasonable business justification for the salary and grade disparities that occurred *before* April 19, 1995, *i.e.*, before the date when he was reclassified and demoted from an E–9 to an E–8 salary grade. On this point, Mr. Coward notes that only the District Court, not the defendant, proffered the explanation that any disparities between Mr. Coward and white employees who were also classified as TNFMs must have been attributable to the fact that Mr. Coward's duties were "narrower" than those of the other TNFMs. *See* Initial Br. of Appellant at 18–19; *see also* Mem. Op. at 7–8, *reprinted in* J.A. 142,208–09 (providing the District Court's "logical inference" that ADT's proffered justification extended to the pre-reclassification period).

On the record at hand, we have no choice but to reverse and remand again for further proceedings before the District Court. Although the District Court was correct in concluding that ADT's justification for salary and grade disparities between Mr. Coward and TNFMs during the post-reclassification period was not pretex-

tual, the court erred in reaching the same conclusion with respect to the period from March 1994 to April 19, 1995, when Mr. Coward was promoted to and worked as a TNFM. As the District Court apparently recognized, *ADT offered no justification whatsoever* for the salary and grade disparities that existed during this period. Thus, it was not for the District Court to "infer" a justification where none was forthcoming from the employer. The case must be remanded for a precise determination as to whether ADT can proffer a nondiscriminatory reason for Mr. Coward's lower salary and grade during the pre-classification period, and whether Mr. Coward can rebut such a proffer, or whether the case must proceed to trial.

\* \* \*

■ In reviewing the District Court's grant of summary judgment, this court reviews the evidence *de novo*. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C.Cir.1999). Indeed, "a party is only entitled to summary judgment if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact." *Id.* (quoting *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1288 (D.C.Cir.1998) (en banc)) (internal quotation marks omitted). Of particular importance in this case, if material facts are susceptible to divergent inferences, summary judgment is not available, because all inferences must be drawn in favor of the non-moving party. *See Alyeska Pipeline Serv. Co. v. United States Envtl. Protection Agency*, 856 F.2d 309, 314 (D.C.Cir.1988). In addition, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Giant Food*, 175 F.3d at 1077 (quoting *Aka*, 156 F.3d at 1288) (internal quotation marks omitted). We review the record in this case with these standards in mind.

\* \* \*

ADT has employed Edward Coward, an African–American male, since October 3, 1974. A supplier of electronic security systems and services, ADT maintains a salary grade structure consisting of grades E–3 through E–20. Each grade has five salary steps. Salary ranges between grades overlap. ADT assigns job titles, codes, and grades to every employee. Employees with the same job title may have different codes, different grades, and even different duties; together, all of these factors determine salary. Job titles generally reflect duties performed and serve as an important factor in setting salary. *See Coward I*, 140 F.3d at 272–73.

■ An E–8 for most of the last 18 years, Mr. Coward was briefly promoted in March 1994 to a TNFM job, in a position purportedly carrying a grade of E–9. Approximately one year later, on April 19, 1995, ADT reclassified him from E–9 back to E–8, later changing his title to "Technical Support." In his reclassified grade and position, Mr. Coward earned less than most TNFMs, all of whom were white; however, he earned more than most Technical Support staff. *See id.* at 273. The main point is that, following his reclassification, Mr. Coward's job duties were narrower than those of employees then working as TNFMs. Not surprisingly, ADT proffered that, *during the post-reclassification period,* Mr. Coward earned less than the cited white employees because he had fewer job responsibilities. Mr. Coward offered nothing sufficient to refute this or to otherwise suggest that the explanation was pretextual.

The problem with this case arises with respect to the pre-reclassification period, *i.e.,* the period when Mr. Coward admittedly was assigned to the position of TNFM. Mr. Coward claimed he was never given an E–9 grade and was never given a salary commensurate with that grade upon promotion. ADT argued otherwise. The District Court noted that the parties disagreed over these points, and the record offers no clear answers.

Mr. Coward says that, in any event, he was paid less than white TNFMs during the cited pre-reclassification period. This hardly seems surprising, because if Mr. Coward was concededly paid less than white TNFMs immediately after his re-classification, he undoubtedly was paid less immediately before the reclassification. In *Coward I*, we said that, "[h]aving identified eight higher-paid white employees, the majority of TNFMs, Coward has satisfied the minimal requirements of a prima facie case." *Id.* at 276. An ADT manager acknowledged in his deposition that there were company records available to address salary disparities during the pre-reclassification period, yet none were offered. *See* Deposition of Edward B. Pictroski at 86–87, *reprinted in* J.A. at 141,624–25. And ADT did not assert before either the trial court or this court that Mr. Coward was fabricating or otherwise wrong in his claim that his salary was below what was being paid to other TNFMs during the period when he was promoted to that position.

█ The District Court sought to escape the problem of ADT's failure to explain the pre-reclassification period by finding a "logical inference" to support a conclusion that Mr. Coward's duties *always* have been narrower than other TNFMs. Mem. Op. at 7–8, *reprinted in* J.A. 142,208–09. We reject this approach as entirely unacceptable under *McDonnell Douglas* and its progeny.

█ First, under the *McDonnell Douglas* framework, a party alleging discrimination must establish a *prima facie* case of prohibited discrimination. *See* 411 U.S. at 802, 93 S.Ct. 1817. Once he has done so, the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision. *See id.* If the employer presents such reasons, then the complainant (who always carries the burden of persuasion) has the opportunity to discredit the employer's explanation. *See id.* at 804–05, 93 S.Ct. 1817. In this case, Mr. Coward has established a *prima facie* case—that is no

longer in issue. ADT was required to respond. And the District Court should not have responded on behalf of ADT.

█ Second, as the District Court plainly recognized, there was a significant difference between the alleged salary disparities in the pre- and post-reclassification periods. In other words, each period warranted a legitimate, nondiscriminatory reason for the challenged employment practices. And the District Court also recognized, as do we, that ADT offered an explanation only for the post-reclassification period.

█ Third, the District Court's purported "logical inference" that Mr. Coward's duties always have been narrower than other TNFMs does not survive scrutiny. For one thing, it does not follow that because Mr. Coward earned a salary below the rate paid to TNFMs *after he was demoted to a lesser grade and a different title* he necessarily should have been paid at a lower rate during a period when he was assigned to the higher TNFM position. The record here indicates that *job title* carries weight in the assignment of job grades and salaries, presumably because a job title denotes something about job responsibilities.

Furthermore, there is at best confusion on the record here as to whether Mr. Coward's job duties changed after he was reclassified. *Compare* Deposition of Edward B. Pictroski at 75, *reprinted in* J.A. 141,613 (observing that when Mr. Coward's job changed from TNFM to Technical Support–SSO, his duties changed), *and* Deposition of Edward Coward at 66, 124–25, *reprinted in* J.A. 141,862, 141,872 (recounting that Mr. Coward was excluded from supervisory meetings after his reclassification), *with id.* at 60, *reprinted in* J.A. 141,861 (noting Mr. Coward's statement that he was "basically doing the same job" after he was demoted from his TNFM status). It appears that ADT's management officials viewed Mr. Coward as being in a lesser position after reclassification

and that Mr. Coward's supervisory position in the company changed. Thus, even if his day-to-day duties remained steady, his status and responsibilities were diminished. If, as appears to be the case, Mr. Coward's position diminished after reclassification, then there is no way to draw a "logical inference" about what he should have been paid as a TNFM performing greater duties before reclassification.

There is another potential *material* issue of fact yet to be resolved on this record. As noted above, the District Court recognized that the parties disagreed over whether Mr. Coward actually received his E–9 grade when he was promoted to the TNFM position. The District Court dismissed this question as "immaterial," on the assumption that the "defendant has introduced evidence that plaintiff's duties were narrower in scope than employees at the E–9 salary grade." Mem. Op. at 8, *reprinted in* J.A. 142,209. However, just as there is no proffer from ADT to explain salary disparities during the pre-reclassification period, there is also no proffer explaining why Mr. Coward may not have received the E–9 grade. Indeed, the District Court's observations on this point are perplexing, because ADT argues that it *did* in fact promote Mr. Coward and then later reclassified him to a lower grade and title. And it surely cannot be said that a higher job grade is insignificant, for, although some salaries overlap two grades, higher grades carry higher scales of pay. Thus, Mr. Coward, like any employee, obviously would have been better off with a higher than with a lower salary grade.

\*     \*     \*

The District Court was correct in concluding that ADT offered a legitimate business justification for salary and grade disparities between Mr. Coward and TNFMs during the post-reclassification period, and that Mr. Coward failed to show that this justification was a pretext for unlawful discrimination. However, the court erred in reaching the same conclusion with respect to the period from March 1994 to April 19, 1995, when Mr. Coward was assigned to work as a TNFM. If there is an explanation to be offered for the pre-reclassification period, it must come from ADT, not the District Court.

As indicated above, our review of the record reveals *material* issues of fact yet to be resolved in the trial court. This might require a trial of the issues, but we are not sure about this. In candor, it appears that the record in this case is a bit of a muddle, so we do not know whether this matter is still susceptible to disposition pursuant to summary judgment. The problem now is that ADT has failed to proffer explanations with respect to practices occurring during a specific time period, and Mr. Coward has had no occasion to respond to any such proffers. It is possible that this can be done after the parties are permitted to supplement the existing record before the District Court and then offer appropriate motions. However, if the material issues of fact survive supplementation and any new motions for summary disposition, the case will have to proceed to trial.

For the reasons given herein, the judgment of the District Court is affirmed in part and reversed in part. The case is hereby remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

The majority affirms the district court's grant of summary judgment for the period of time after April 19, 1995,[1] but remands the case on the theory that certain uniden-

---

1. Presumably, the majority also affirms the grant of summary judgment in ADT's favor on Coward's retaliation claim.

tified wage and grade disparities existed between plaintiff Edward Coward and other Telecommunications Network Facilities Managers ("TNFMs") between March 1994 and April 19, 1995, disparities that it believes ADT failed to justify. I think the remand is unwarranted. Coward has not established a prima facie case for the earlier period; ADT's nondiscriminatory explanation for Coward's pay and grade for the period after April 19, 1995 is, moreover, equally applicable to the prior period and stands equally unrebutted. I believe the district court properly ordered summary judgment in ADT's favor on Coward's entire claim, and therefore respectfully dissent.

\*　　\*　　\*

Under the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Coward has the burden of demonstrating by a preponderance of the evidence that he was performing work substantially equal to that of a white employee who was compensated at a higher rate than he was. *Coward v. ADT Security Sys., Inc.,* 140 F.3d 271, 273 (D.C.Cir.1998) ("*Coward I*"). In the first appeal in this case, we determined that Coward had established a prima facie case of wage discrimination. See *id.* at 275–76. *Coward I* did not, however, specify the time period covered by the prima facie case. Yet the majority now assumes that *Coward I* must have found a prima facie case for the entire period addressed in Coward's complaint. "Coward has established a prima facie case—that is no longer in issue. ADT was required to respond." Maj. Op. at 159. Under this logic, the recognition by a panel of this court that a prima facie case existed for any period of time compels the conclusion (under law-of-the-case principles) that the prima facie case extends to the entire period covered by plaintiff's *allegations*. But allegations are notoriously not evidence. The only *evidence* in the record concerns wage and grade disparities *after* April 19, 1995.

Thus the panel leaves unanswered the question of what it is to which ADT must respond.

The purpose of the *McDonnell Douglas* framework is to "sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In the panel's hands it seems to have quite the opposite effect: by assuming the existence of a prima facie case for a period where the evidence shows none, it blunts rather than sharpens the inquiry, requiring the defendant to explain what has not been shown even to exist.

Indeed, the panel appears to reason that once allegations are filed, a prima facie case exists *unless* the defendant comes forward with proof of its absence. Thus it faults ADT for not reaching back into its records unbidden to establish a prima facie case for Coward, saying that although an ADT manager said there were salary records for the period before April 19, 1995, "none were offered." Maj. Op. at 159. Use of the passive voice is telling: Yes, no one bothered to show a wage disparity for that period—neither Coward, who had the burden, nor ADT, which didn't. I do not understand why ADT should be penalized for Coward's omission. The majority persists in shifting the initial burden onto ADT: "And ADT did not assert before either the trial court or this court that Mr. Coward was fabricating or otherwise wrong in his *claim* that his salary was below what was being paid to other TNFMs during the period ... when he was promoted to that position." Maj. Op. at 159 (emphasis added). Again, as Coward's "claims" are not evidence, ADT had no need to rebut them.

The majority invokes the principle of continuity, saying that as Coward was paid less than certain comparison employees in the post-reclassification period it stands to reason that he was paid less in the period immediately preceding classification. Maj. Op. at 158. The principle of continuity is

generally a sound one: the basic reason why we believe the sun will rise tomorrow is the persistence of the pattern—of its rising, day after day, and, in our modern sophisticated times, the persistence of all the complex associated astronomic phenomena. In this case, however, use of the principle is questionable. First, the majority's whole claim that ADT's stated explanation does not cover the earlier period turns on the notion—false, as it turns out—that Coward suffered some painful downgrade on April 19, 1995. If he had, the inference of continuity would be self-evidently inapplicable as a matter of fact. Second, there were hard data in the record in the post-April 19, 1995 period; Coward offered none for the period before, although, as the majority rightly notes, the data were available to him. So the parties unsurprisingly focused most clearly on the later time. Thus use of the principle of continuity to create a prima facie case is procedurally askew. In short, Coward's failure to offer evidence for a prima facie case should end the matter.

\* \* \*

Nonetheless, it turns out that even if we assume a prima facie case for the earlier period, ADT's evidence rebuts any inference of discrimination. The majority theorizes that the record is in conflict over ADT's justification of supposed disparities. Its analysis turns essentially on two propositions that in reality are contradicted by the evidence. First, it asserts that there may have been some material *reduction* in Coward's duties in the Spring of 1995. If true, then of course ADT's evidence—showing that his post-April 19, 1995 responsibilities were less than those of the employees with whom Coward compared himself—would not work for the prior period. But in fact the record is plain that there was no such reduction in duties. To summarize the basic evidence: (1) Soon after Coward was moved to the Sales and Service Office ("SSO") in Springfield, VA, in February 1994, he received the title TNFM. (2) In the Spring of 1995 ADT concluded that Coward, who was the only employee designated a TNFM who worked outside of a Customer Monitoring Center ("CMC"), a class of facility different from the SSO at Springfield, was doing less demanding work than the TNFMs at CMCs. (3) ADT therefore reclassified Coward out of TNFM status and into "Technical Support–SSO." (4) Accordingly, when ADT's evidence showed that for the period after April 19, 1995 Coward's work demanded less than that of the then remaining TNFMs (his supposed comparison employees), it simultaneously showed that his prior work demanded less than that of the other TNFMs—the same group of comparison employees. In short: post-April 19, 1995—Coward's work was less than TNFMs; pre-April 19, 1995—his work was less than that of "other" TNFMs, a group to which he was added only because of confusion over his job title.

Second, the majority suggests that the record is in conflict over whether Coward ever received an elevation from pay grade E–8 to pay grade E–9. It is obscure why the majority regards this as material: the record is crystal clear that the two pay grades overlapped almost completely. The difference in the mid-point of the grades as of January 1, 1995 was very small—less than $3500 ($35,644 v. $38,971); but the spread of each grade was huge: E–8 sprawled from $28,826 to $42,241, and E–9 from $31,265 to $46,288. See Joint Appendix ("J.A.") 1776.[2] In any event, as we shall see, Coward did get moved to E–9 and then back to E–8; his actual salary kept increasing throughout the entire period and was at all times within the range for both grades.

Sprinkled over the majority's torture of the record is the further suggestion that ADT failed even to *claim* that its post-April 19, 1995 defense embraced the earlier period. This is not true. Accordingly, in addressing the evidence I will also note

---

**2.** I omit the initial two numbers from each citation to the Joint Appendix.

the correspondence between the evidence and ADT's reasoning.

*Coward's duties.* Coward and ADT agree that Coward received the title TNFM in March 1994. Despite the "promotion," Coward testified that his duties remained basically the same when he acquired and then lost the title TNFM and the pay grade E–9. He said, "[The TNFM title] was not a promotion. It was just something that was set up to match the jobs that I was doing.... It was actually what I had been doing for the past 10 or 12 years." *Deposition of Edward Coward* ("Coward Dep.") at 57, J.A. 1851, 1861. He continued, "I assume [the title Technical Support–SSO is] just another ADT term because I'm basically doing the same job." *Id.* His opening brief here agreed: "To date, there has been little, if any, change in Coward's responsibilities as a TNFM." Appellant's Initial Br. at 3.

In the Spring of 1995, the Mid–Atlantic Division president reviewed the duties of all Capital Region employees. During this review, ADT found that the only nominal TNFM at an SSO (i.e., Coward) had narrower duties and responsibilities than other TNFMs. See Swinarski Decl. at 7 ¶ 21, J.A. 1773 (stating that Coward's pay grade was changed for reasons of internal equity after ADT determined that his duties were "significantly narrower than those of the [TNFMs] assigned to CMC's."). Because ADT compared Coward to all of the other TNFMs in the region at a time when Coward's duties were as broad as they had ever been, its reasons for paying him less than TNFMs at CMCs apply to the entire period at issue in this case.

ADT's summary judgment motion invokes this evidence. See ADT's Supplemental Memorandum in Support of Summary Judgment at 9–10, J.A. at 2182–83. Although ADT referred to the division president's review both in its discussion of the decision to lower Coward's pay grade and the subsequent decision to change his title, the point of the pay grade analysis in ADT's motion for summary judgment is that effective April 19, 1995, Coward's pay grade was adjusted to match the scope of his duties before and after that date. See *id.* His title, however, was not changed until ADT decided that it would not assign additional duties to Coward to bring him in line with others who held the TNFM title. See Deposition of Edward B. Pictroski ("Pictroski Dep.") at 64, 73–76, J.A. 1602, 1611–12 (noting that Coward did not receive the title Technical Support–SSO until May 17, 1995, once ADT determined that it would continue to confine the broader telecommunication networking duties to workers at CMCs). ADT made the point explicitly in its motion for summary judgment. See ADT's Supplemental Memorandum in Support of Summary Judgment at 10, J.A. 2183.

Coward's poster child comparison worker—supposedly doing the same work but paid more—was John Wyatt, a TNFM in Baltimore. It is now undisputed that his network and management duties exceeded those of Coward; indeed, he decided which continuing education courses workers such as Coward would take. See Coward Dep. at 102–03, J.A. at 1868–69. But his duties had not suddenly eclipsed Coward's after April 1995: he served as a facilities manager from the time he started with ADT in *1987* into the period of litigation itself. See Deposition of Michael Kennelly ("Kennelly Dep.") at 43–44, J.A. 1644, 1686–87 (identifying Wyatt as having started his facilities management work as of 1987 and having broader duties than Coward because he was responsible for the facilities for a large portion of the Mid–Atlantic Division). In its brief on summary judgment ADT pointed to the Wyatt–Coward comparison, never suggesting any time limits on the contrast in duties.[3] See ADT's Supplemental Memorandum in Support of Summary Judgment at 10 & n.5, J.A. at 2183 & n.5 (noting that Wyatt had

---

**3.** Of course its reference to pay alluded to the *only* pay comparison data in the record, which did relate to the post-April 19, 1995 period.

substantial network and management duties that exceeded those assigned to Coward).

The majority concludes its analysis of Coward's duties by suggesting that no comparison can be drawn between Coward and the TNFMs because Coward's responsibilities declined after he was reclassified. As we have seen, the evidence in fact shows that the reclassification occurred simply to bring Coward's title into line with his real responsibilities. There is no evidence supporting the idea that the reclassification brought on a reduction in duties. The majority cites the testimony of ADT's director of benefits and compensation, Edward B. Pictroski. See Maj. Op. at 159–60. While Pictroski testified that Coward's "duties" changed when his job changed from TNFM to Technical Support–SSO, see Pictroski Dep. at 75, J.A. at 1614, it is plain that this referred only to the uncontested fact (indeed, the tautology) that Coward's general *job description* changed when he was classified as Technical Support–SSO. Pictroski explicitly acknowledged that he had no idea what Coward actually did on a day-to-day basis. See *id.* at 76, J.A. at 1614. Given that ADT offered him solely to describe corporate policy, see Appellee's Br. at 10–11, the ignorance is hardly surprising.

The majority also cites Coward's exclusion from supervisory meetings as evidence that his duties changed. Maj. Op. at 159–60. But Coward gave this testimony about exclusion from a supervisors' meeting on *October 1, 1996*, at least 19 months after the supposed down-grading. Coward stated explicitly that the exclusion occurred "*a few days earlier*." See Coward Dep. at 66, J.A. at 1862 (emphasis added); see also *id.* at 65–66, J.A. at 1862 (explaining that he had complained about the exclusion in "a conversation I had with my immediate boss *last week* concerning my status with the company" (emphasis added)). Obviously such attendance could not have been a critical difference between the TNFM and Technical Support–SSO jobs if

it took until late September of 1996 for ADT to stop inviting Coward to the meetings, or at least for Coward to notice his exclusion. The change described by Coward (assuming it occurred) was plainly a change *within* the period for which we all agree summary judgment was proper, not a change *between* the two periods.

*The elevation to salary grade E–9.* There is no basis for the majority's uncertainty as to whether Coward ever received the E–9 grade. See Maj. Op. at 159–60. Coward's "Personnel Data Maintenance Form" shows the shift from E–9 to E–8 effective April 19, 1995, J.A. 1799. No change in actual pay occurred at the time; this is unsurprising as there was no change in duties and his pay at the time was comfortably within the ranges for both nominal pay grades. See J.A. 1776 (listing the salary ranges for each grade).

In short, even if we accept the majority's application of the continuity principle (i.e., the supposition that Coward must have earned less than some TNFMs prior to his reclassification because he earned less than some TNFMs after reclassification), it turns out that ADT's explanation of the superficial discrepancies of the post-April 19, 1995 era covers the *entire* period that Coward's complaint—though not his evidence—purported to put in issue.

\* \* \*

For the foregoing reasons, I concur in the court's judgment affirming summary judgment for the period after April 19, 1995, but dissent from it insofar as it remands the case for further proceedings.