# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 21, 2014           Decided July 15, 2014

No. 11-7048

ARMENIAN ASSEMBLY OF AMERICA, INC., ET AL.
APPELLANTS

v.

GERARD L. CAFESJIAN, ET AL.,
APPELLEES

Consolidated with 11-7049, 11-7054, 11-7055, 11-7056,
11-7057, 11-7110, 11-7111, 11-7112, 13-7050, 13-7051

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cv-01259)
(No. 1:08-cv-00255)
(No. 1:08-cv-01254)

*William S. Consovoy* argued the cause for appellants/cross-appellees. With him on the briefs were *Brendan J. Morrissey*, *Helgi C. Walker*, and *Richard I. Chaifetz*.

*John B. Williams* argued the cause and filed the briefs for appellees/cross-appellants.

Before: GARLAND, *Chief Judge*, WILKINS, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Nearly a century ago, around the start of the First World War, the Ottoman Turkish government engaged in a years-long conflict with its Armenian population.  According to the parties to these appeals, this is "the single most resonant occurrence in modern Armenian culture," in which "approximately one and a half million Armenians were killed and hundreds of thousands were deported and forcibly converted" in what they refer to as the "Armenian Genocide."  Joint Appendix ("J.A.") 237 (Joint Pretrial Statement ¶¶ 13-14).[1]  Far more recently, beginning in the 1990s, a coalition of dedicated individuals came together to create an "Armenian Genocide Museum" here in Washington, D.C.  This litigation springs from their efforts—or, more accurately, the unraveling of their efforts—to bring that vision to life.

The venture began successfully enough.  Buoyed with enthusiasm, the architects behind the project set to work. They secured sizeable funding contributions, and they formed a nonprofit corporation, the Armenian Genocide Museum and Memorial ("AGM&M").  They also agreed on and purchased a historic building for the museum's site, just a few blocks from the White House.  But as the years wore on, they were unable to agree on much else.  Progress staggered.  Tensions

---

[1]  We are well aware of the longstanding dispute in the global community about the characterization of these events, particularly the use of the term "genocide."  As they did in the court below, the parties all use that label; we endorse no view ourselves.

mounted. Little true headway was made. Eventually, one of the project's principal founders and benefactors, the late Gerard Cafesjian, chose to part ways with the group and resigned his post as President of AGM&M.[2] The split was far from amicable. And so began a chain of events culminating in this tangle of litigation.

After several years of legal wrangling, the parties' claims ultimately proceeded to a bench trial before the District Court. Save for a single cause of action, all of the claims were found unproven. Post-trial proceedings ensued on a multitude of issues, and, after many of the District Court's decisions were appealed on a piecemeal basis, the assorted cases on appeal were consolidated and presented to us for resolution. Disagreeing with the parties' challenges to the rulings below, we affirm the District Court on all accounts.

**I.**

The factual backdrop surrounding these appeals is, to put things mildly, lengthy. The District Court's findings of fact alone span nearly seventy-five pages in the Federal Supplement. *See Armenian Assembly of Am., Inc. v. Cafesjian*, 772 F. Supp. 2d 20, 28-102 (D.D.C. 2011). Hoping to keep things a bit more simple, we recount only the facts relevant to our disposition and otherwise commend the interested reader to the District Court's able and thorough synopsis of this dispute's history.[3]

---

[2] Cafesjian passed away during the pendency of these proceedings, in September 2013. Per Federal Rule of Appellate Procedure 43(a)(1), we allowed the substitution of Kathleen Baradaran, Cafesjian's personal representative, in his stead.

[3] Unless specifically denoted by a citation to the Joint Appendix, we draw record support for our factual statements from the District Court's findings of fact.

4

**A.**

In the mid- to late-1990s, several individuals resolved to coordinate their efforts to create an Armenian Genocide Museum.

One of the groups behind these efforts was the Armenian Assembly of America (the "Assembly"). Founded as a charitable, nonprofit organization, the Assembly advocates for and educates the public about Armenian issues in the United States. Over the years, many have been involved with the Assembly's leadership and work, but only a few names are relevant to the issues we confront in this dispute. Hirair Hovnanian is one of the Assembly's founders and has served as the chairman of its board of trustees since the 1970s; Robert Kaloosdian is another founder of the Assembly and has served as a long-time trustee on its board; and Anoush Mathevosian is an Armenian-American philanthropist who, over the years, has dedicated a wealth of her time and money to the Assembly's work, including as a trustee herself. These folks were all involved, in some way or another, with the Assembly's early efforts in creating a museum.

During this same period, Cafesjian was independently planning a similar endeavor: the construction of a memorial dedicated to the victims and survivors of the "Armenian Genocide," though not necessarily to be built in Washington, D.C. He and John Waters, Jr.—Cafesjian's "right-hand man"—channeled their work on this project through the Cafesjian Family Foundation ("CFF"), a charitable organization founded by Cafesjian and his family. As luck would have it, the two groups discovered the other's plans, and they arranged to meet to discuss the possibility of a combined museum and memorial. Not long after, Cafesjian

and Waters officially joined the Assembly as trustees, although they continued to search separately for a potential site for the memorial. That is, until the Assembly came upon a prime location for the project in the heart of D.C.: the National Bank of Washington Building ("Bank Building").

The Bank Building sits at the corner of 14th and G Streets N.W., practically a stone's throw from the White House. It is designated as a historic District of Columbia landmark, both by the National Register of Historic Places and the D.C. Inventory of Historic Sites.[4] The Assembly reached out to Cafesjian about the Bank Building, and Cafesjian was extremely interested. He quickly dispatched Waters to conduct the necessary due diligence on the property, and the group as a whole decided to move forward, agreeing to develop the site as a consolidated museum and memorial. Cafesjian donated $3.5 million to the Assembly to help acquire the Bank Building, and Mathevosian also pledged $3.5 million for its purchase. Because Mathevosian could not access her share of the funds by the closing date, however, Cafesjian (largely through CFF) floated the Assembly an interest-free bridge loan of $4 million to ensure the deal could go through. The Assembly closed on the Bank Building in February 2000, for a purchase price of $7.25 million. Upon receipt of Mathevosian's pledge, the Assembly repaid $3.5 million to CFF in March 2000 and executed an interest-free promissory note to CFF for the remaining $500,000, originally payable in May 2000.

---

[4] The property is also known as the "Federal-American National Bank" and the "Hamilton National Bank." *See* U.S. Dep't of Interior, National Park Service, *National Register of Historic Places Registration Form* (Nov. 23, 1994), *available at* http://pdfhost.focus.nps.gov/docs/NRHP/Text/94001517.pdf (last visited July 14, 2014) (describing the property and its historical architecture and elements).

The Bank Building, as it turns out, would not be the only property set aside for the project's development. Following the Assembly's purchase of the Bank Building, Cafesjian began to acquire additional properties along G Street, adjacent to the Bank Building. Between March 2000 and September 2003, Cafesjian—through one of his other companies, TomKat Limited Partnership—purchased four additional properties, located at 1334-36, 1338, 1340, and 1342 G Street N.W. ("Adjacent Properties"). All these properties were paid for in full at closing, with the exception of 1340 G Street, which was payable by installment contract; after the deal closed in March 2001, regular, annual payments on that property were to be made, with a final balloon payment due at the end of ten years. Originally, Cafesjian bought these properties with an eye toward using them for a contemporary art museum, but after that concept was abandoned, Cafesjian decided to donate the properties to the Assembly to expand the footprint of the museum effort.

Having lined up a site for the project, the Assembly set to work to bring the concept to life. Initially, this work was spearheaded by a planning committee formed within the Assembly, but, as the District Court noted, the committee "was a somewhat fluid body," with about a dozen different individuals involved at one point or another. *Armenian Assembly of Am.*, 772 F. Supp. 2d at 36. With so many cooks in the kitchen, suffice it to say that the formation of the planning committee was not a recipe for success. After much talk and little action over the next several years, the Assembly's board ultimately decided to create an independent entity to focus on the museum's development. Thus was born AGM&M.

AGM&M was incorporated as a District of Columbia not-for-profit corporation in October 2003. Under the articles of incorporation and bylaws, control of AGM&M was vested in a board of trustees, initially composed of Cafesjian (representing CFF), Kaloosdian (representing the Assembly), Hovnanian, and Mathevosian. By way of a unanimous written consent agreement signed at AGM&M's inception, all four trustees agreed to appoint Cafesjian as Chairman and President of AGM&M, Hovnanian as Vice Chairman, and Waters as Secretary and Treasurer. AGM&M's mission would be focused exclusively on the development and creation of the museum and memorial project.

Because Cafesjian agreed to route his donations to AGM&M through the Assembly, the parties set up a legal two-step. First, Cafesjian and CFF entered into a grant agreement with the Assembly ("Grant Agreement"), memorializing the terms of their gifts to the Assembly; second, the Assembly then agreed to transfer to AGM&M all of its museum-related assets and obligations, including the Bank Building and the Adjacent Properties, through a separate transfer agreement.

One part of the Grant Agreement—a provision the parties consistently refer to as a "reversion clause"—plays a central role in this litigation. It reads as follows:

> If the Grant Property is not developed prior to December 31, 2010[,] in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

> > (i) in the event any portion of the Grants has not been funded, this Agreement terminates; and
> >
> > (ii) to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

J.A. 463 (§ 3.1(B)). The capitalized terms "Grantor," "Grants," and "Grant Property" are all specifically defined elsewhere in the Grant Agreement. "Grantor" is defined as Cafesjian and CFF, together. J.A. 461. The "Grants" are made up of the "First Grant" and the "Second Grant," which are defined, respectively, as (1) the share of funds contributed by CFF for the Bank Building's purchase (and an additional amount to be used for the installation of a memorial), and (2) the funds contributed by CFF and Cafesjian to acquire the Adjacent Properties. J.A. 461-63 (§§ 1.1-1.3, 2.1-2.3). Further, "Grant Property" is defined as the combination of the "First Grant Property" and the "Second Grant Property," terms themselves defined as the Bank Building and the Adjacent Properties, respectively. J.A. 461-63 (§§ 1.2, 2.2, 3.1(A)). The "Plans" described in this provision refer to design plans for the project as approved by the AGM&M board at some point in the future.[5]

---

[5] The Grant Agreement also required the Assembly to reissue a $500,000, interest-free promissory note to replace the previous note issued to CFF. It designated the maturity date on the note as December 31, 2005. J.A. 467 (§ 5.4(B)). The promissory note was to be transferred to AGM&M, along with all other museum-related assets and liabilities.

With the newly formed AGM&M at the reins, the group was infused with a renewed sense of hope that the museum project would finally get off the ground. But as the old French proverb goes, sometimes, the more things change, the more they stay the same.

Though AGM&M's board of trustees convened several meetings to develop an action plan for moving forward, consensus was an elusive target. They considered hiring an executive director and even received resumes from several qualified candidates, but they never moved forward with interviews, albeit in part due to a sense that AGM&M lacked the funds needed to create the position. The board also tried to begin selecting an architect for the project, but they could not even agree on the *process* to select an architect, let alone the actual architect. The board did agree to hire, on a four-month trial basis, a consultant to develop a business plan for the project, but her plan met with disapproval, and her relationship with AGM&M was not renewed. All the while, amid this general atmosphere of inaction, AGM&M was facing financial difficulties. Most of its funding contributions were tied up in the real estate acquisitions, and the carrying costs of the properties and other basic operating expenses were draining AGM&M's coffers. Despite these fiscal challenges, the organization had no real fundraising initiatives underway at the time.

Around this period, tensions began to mount between Cafesjian and Hovnanian, amplified by a variety of issues that surfaced between the two. The gritty details are beyond the scope of this opinion. For our purposes, we can fast forward to 2006, when Cafesjian concluded that his differences with Hovnanian had become irreconcilable. After failed efforts to reach an agreeable transition plan and a mutually acceptable distribution of the museum-related properties, Cafesjian sent a

letter to the AGM&M trustees in September 2006, announcing his resignation as Chairman and President of AGM&M effective immediately; he also communicated that Waters would resign as Secretary and Treasurer (that resignation became effective about a month later).[6]

In the wake of the late-2006 shake-up, AGM&M reconstituted its leadership, effectively transferring control to the leadership of the Assembly. Work on the museum resumed—at least for a stint. The board of trustees created a "building and operations committee" to assume responsibility for the planning of and fundraising for the museum. And the committee made some tangible progress. It retained project-design and architecture firms to develop a "master planning document," and those plans were completed in October 2007. At that point, AGM&M anticipated the museum would open by April 2010. The committee also obtained an adjustment from the D.C. Board of Zoning Adjustments, to allow for the construction of an annex on a vacant section of the Bank Building plot, and it was able to secure preliminary approval of the museum's design from the D.C. Historical Preservation Review Board in March 2008. In early 2008, the committee even selected a general contractor for the museum's construction. In short, as the District Court found, AGM&M's building and operations committee "worked furiously through late 2007 and early 2008." *Armenian Assembly of Am.*, 772 F. Supp. 2d at 99.

But by March 2008, it became clear that AGM&M was facing substantial fundraising problems. In mid-2008, the committee put the project on hold while they sought additional ways to raise money. They pursued fundraising

---

[6] Cafesjian would remain on the trustee board until May 2007, and Waters until March 2009.

contributions from donors to keep the project going, but to no avail. These fundraising difficulties, the District Court found, were due in substantial part to ongoing litigation implicating the museum project. *Id.* at 101 ("The Assembly tried to solicit major donors for large contributions to keep the museum project going forward, but the dispute with Cafesjian had somewhat poisoned the donor well."); *id.* at 116 ("[T]he ongoing litigation may have dampened donor enthusiasm for the project.").[7] Ultimately, in 2009, AGM&M ran out of funds entirely and could not continue to pay its contractors, resulting in liens being filed.

The museum never moved beyond the design stage. And with the project stalled altogether, the parties' focus shifted almost entirely to this litigation, the history of which we turn our attention to next.

**B.**

Cafesjian and CFF filed the first lawsuit in April 2007, suing the Assembly in the U.S. District Court for the District of Minnesota. They alleged that the Assembly had failed to reissue the $500,000 promissory note as required by the Grant Agreement, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The

---

[7] Another fundraising approach the committee pursued was attempting to lease space in one of the Adjacent Properties—the "Families USA building" located at 1334-36 G Street N.W. Unable to secure any interest from potential third-party tenants, AGM&M finally opted to enter into a lease with the Assembly, which moved into the space in May 2009. The original term of that lease expired on December 31, 2010, but the arrangement was subject to an automatic, five-year renewal period absent either party's notice of termination. J.A. 769-810. The validity of this lease is one of the issues we are asked to decide through these appeals.

complaint sought damages of $500,000, as well as rescission of the Grant Agreement and restitution of all grants and donations made therein.

AGM&M responded in kind. Two months later, in June 2007, AGM&M filed suit against CFF in the Superior Court of the District of Columbia, seeking to quiet title to the museum-related properties; that case was removed to federal court. Then, in September 2007, CFF brought a separate lawsuit against AGM&M and its trustees in U.S. District Court for the District of Columbia, seeking to enjoin any further development of the museum without input from CFF. That same month, AGM&M and the Assembly demanded arbitration based on a clause in the transfer agreement, and that move prompted Cafesjian, Waters, CFF, and TomKat to file another lawsuit in the Minnesota District Court to enjoin the arbitration proceedings, on the basis that they were not parties to the transfer agreement. Cafesjian, Waters, CFF, and TomKat next filed an action in the Minnesota District Court on February 14, 2008, seeking declaratory relief against AGM&M and the Assembly, and that case was subsequently transferred to the D.C. District Court. On February 15, 2008—one day after the prior lawsuit hit the docket— AGM&M and the Assembly brought yet another case in D.C. District Court against Cafesjian, Waters, and CFF; several months later, in July 2008, Cafesjian, Waters, and CFF asserted, in that same case, several counterclaims against AGM&M and the Assembly. Of these six—count them, six—separate lawsuits, several were dismissed. The original lawsuit filed in April 2007 was dismissed by the Minnesota District Court for failure to join AGM&M as a necessary party; the October 2007 lawsuit filed in Minnesota District Court was eventually dismissed by stipulation of the parties; and the parties also stipulated to the dismissal of the lawsuit that was filed in D.C. District Court in September 2007. This

left three cases that were consolidated before the District Court below.[8]

The remaining cases ultimately proceeded to a bench trial in November 2010. Plaintiffs AGM&M and the Assembly ("Appellants" here) pressed four claims: (1) that Cafesjian and Waters, through a variety of misconduct, breached their fiduciary duties as trustees and officers of AGM&M; (2) that Cafesjian and Waters breached their fiduciary duties as trustees of the Assembly; (3) that Cafesjian breached the duty of good faith and fair dealing implicit in the Grant Agreement with the Assembly, both by mismanaging the museum project and by obstructing progress on the museum after resigning; and (4) that Cafesjian and Waters misappropriated the Assembly's trade secrets. They also sought a declaratory judgment deeming the Grant Agreement's reversion clause unenforceable and quieting title to the properties. Defendants Cafesjian, Waters, and CFF (here, "Appellees") asserted counterclaims against AGM&M and the Assembly, generally claiming breaches of the Grant Agreement and the transfer agreement, including by failing to reissue and repay the promissory note, by excluding CFF from the planning process, and more. Relatedly, they argued that AGM&M's lease of space to the Assembly was a breach of its contractual obligations under the Grant Agreement to use the Adjacent Properties only "as part of" the museum project. Finally, Cafesjian and Waters sought indemnification from AGM&M under the bylaws for costs expended in defending against its claims for breach of fiduciary duty.

---

[8] During the pendency of these proceedings, Cafesjian arranged for a *lis pendens* to be recorded with the D.C. Recorder of Deeds to serve as notice of the ongoing litigation concerning the museum-related properties. *See* J.A. 615-17.

In January 2011, the District Court issued its Findings of Fact and Conclusions of Law. Save for one set of claims, the District Court concluded that neither side proved the merit of its claims. The sole exception was Cafesjian's and Waters' claims for indemnification as against AGM&M, which the District Court found meritorious. *See Armenian Assembly of Am.*, 772 F. Supp. 2d at 102-27. The District Court also ruled that the reversion clause in the Grant Agreement was valid and enforceable, though it requested further briefing on the precise contours of the resulting property transfer. *Id.* at 121-22, 127. The court further found that AGM&M validly entered into the lease of the Families USA building with the Assembly. *Id.* at 125-26. Finally, the District Court concluded that AGM&M had wrongly excluded CFF as a trustee and thus ordered that CFF was entitled to appoint a representative to the AGM&M board. *Id.* at 128-29.

Subsequently, AGM&M and the Assembly filed a motion seeking a new trial, based on the trial judge's supposedly undisclosed bias toward Cafesjian. The motion was principally based on the theory that the judge was incapable of being impartial because she and Cafesjian (along with several other donors) made a gift to the Metropolitan Museum of Art years prior, and because she and Cafesjian supposedly shared an interest in fine glass art. The District Court denied that motion in a published opinion. *Armenian Assembly of Am. v. Cafesjian*, 783 F. Supp. 2d 78 (D.D.C. 2011). The same date, the District Court issued a separate opinion concluding that, under the reversion clause, CFF was entitled to transfer of the properties in their entirety, without any setoff amount owed to AGM&M; that decision also reaffirmed the indemnification ruling in the face of renewed challenges by AGM&M, though the court referred the matter to a Magistrate Judge for a recommendation as to the specific

amount of the award. *Armenian Assembly of Am. v. Cafesjian*, 772 F. Supp. 2d 129 (D.D.C. 2011).

As the dispute began to make its way into our hands on appeal, a few additional developments followed at the trial level. In September 2011, the District Court concluded that the Assembly's lease in the Families USA building remained valid even after transfer of the property to CFF under the reversion clause. *Armenian Assembly of Am. v. Cafesjian*, 811 F. Supp. 2d 120 (D.D.C. 2011). Subsequently, the Magistrate Judge issued a Report and Recommendation on the indemnification issue, and after evaluating several objections, the District Judge adopted that recommendation with minor adjustments in February 2013. *Armenian Assembly of Am. v. Cafesjian*, 924 F. Supp. 2d 204 (D.D.C. 2013) (awarding Cafesjian and Waters about $1.45 million in fees, plus post-judgment interest). Finally, the District Court denied a second motion for new trial filed by AGM&M and the Assembly, disagreeing that a newly filed lawsuit by Waters against Cafesjian merited another trial in the instant dispute. *Armenian Assembly of Am. v. Cafesjian*, 924 F. Supp. 2d 183 (D.D.C. 2013).

The parties timely appealed many of the District Court's rulings, and we consolidated the cases for our review. The moving parts in these consolidated appeals are myriad, but, as best we can distill things, there are five principal issues we must tackle: (1) the disposition of Appellants' claims for breach of fiduciary duty against Cafesjian and Waters; (2) the enforcement of the Grant Agreement's reversion clause, pursuant to which CFF took full title to the Bank Building and the Adjacent Properties; (3) the indemnification of Cafesjian and Waters and the associated award; (4) the denial of Appellants' post-trial motions for relief; and (5) the validity of the Assembly's lease in the Families USA

building. In the sections that follow, we take each issue in turn.

## II.

We first examine Appellants' claims against Cafesjian and Waters for breach of fiduciary duty. On this issue, we review the District Court's legal determinations *de novo* and its findings of fact for clear error. *Gov't of Rwanda v. Johnson*, 409 F.3d 368, 372 (D.C. Cir. 2005).

At the outset, all agree that, because both AGM&M and the Assembly are District of Columbia nonprofits, District of Columbia law governs these claims. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 309; *cf. Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1268 (D.C. Cir. 1972). Under District law, it is well settled that a nonprofit corporation's directors and officers owe fiduciary duties to the organization, just the same as with any corporation. *Willens v. 2720 Wis. Ave. Coop. Ass'n, Inc.*, 844 A.2d 1126, 1136 (D.C. 2004); *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1210 (D.C. 2002). These duties are multifaceted: "[A] director or officer of a corporation owes the corporation complete loyalty, honesty, and good faith." 3 FLETCHER CYC. CORP. § 837.50 (2010 rev'd volume) (cited approvingly in *Willens*, 844 A.2d at 1136, and *Friends of Tilden Park*, 806 A.2d at 1210); *cf. Cahn v. Antioch Univ.*, 482 A.2d 120, 131-32 (D.C. 1982).

According to Appellants, Cafesjian and Waters violated these fiduciary responsibilities by engaging in a series of actions—both during their tenure with AGM&M and after—engineered to thwart AGM&M's mission and derail the museum's progress. To prevail, Appellants shouldered the burden of establishing not only the existence and breach of an

underlying duty by Cafesjian and Waters, but also a resultant injury proximately caused by such breach. *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr LLP*, 68 A.3d 697, 709-10 (D.C. 2013). The District Court thought they came up short. Appellants now attack that outcome from several angles, but because they fail to convince us that the District Court erred in finding the injury element unproven, we need not engage with their other arguments as to the breach element. *See Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 709 (D.C. 2009). On the injury front, Appellants press two main arguments. Neither is persuasive.

*First*, Appellants contend that the District Court failed to properly consider whether Cafesjian's and Waters' conduct caused AGM&M to lose donations needed to move forward with the museum's development. This inability to fundraise, they insist, was an injury proximately caused by Appellees. We disagree. The District Court determined, as a factual matter, that "the evidence at trial did not establish that any donors changed their decisions to donate based on Defendants' conduct." *Armenian Assembly of Am.*, 772 F. Supp. 2d at 116-17; *id.* at 116 ("[T]he record does not clearly show that any actions by Cafesjian and Waters caused AGM&M to lose donors."). "At most," the District Court found, "the evidence showed that donors chose to withhold their donations until the litigation was resolved and/or the museum was opened," and, since both sides contributed to the cloud of litigation enveloping the museum project, the District Court concluded that "donors'[] concerns about 'the litigation' cannot be attributed solely to Defendants." *Id.* at 117. These factual findings must stand unless "clearly erroneous," FED. R. CIV. P. 52(a)(6)—that is, unless "we are left with a firm conviction that a mistake has been committed," *Koszola v. F.D.I.C.*, 393 F.3d 1294, 1300 (D.C.

Cir. 2005)—and, despite Appellants' conclusory arguments to the contrary, no such conviction compels us here.

*Second*, Appellants contend that AGM&M was injured when Cafesjian and Waters recorded a *lis pendens* for the museum-related property in June 2008, *see* J.A. 615-17, which they contend "stopped construction in its tracks." Appellants' Br. at 54. As Appellants' argument goes, once the *lis pendens* was filed (and for so long as it remained on the books), AGM&M was legally unable to make any improvements or changes to the affected property, thus rendering impossible completion of the museum project by the Grant Agreement's December 2010 deadline. We are unconvinced. Even if we were to accept that a *lis pendens* operates as the sort of absolute, legal roadblock Appellants claim—a question we do not reach—their theory stands at odds with the District Court's findings of fact. As explained above, the District Court found that "the reason [AGM&M] put a 'pause' on the development was a lack of funding to continue the project." *Armenian Assembly of Am.*, 772 F. Supp. 2d at 116. It made no mention of the *lis pendens* impeding the project's progress. So in light of the District Court's factual findings, to which we defer, the filing of the *lis pendens* was not the cause of any claimed injury. We therefore reject this theory as well.

Otherwise, Appellants have abandoned the other claims of injury advanced below—increased tax consequences, legal fees, and others, *see Armenian Assembly of Am.*, 772 F. Supp. 2d at 116-17—and we need not pass on them here. In sum, because Appellants failed to prove that they were injured by any of the supposed breaches they attribute to Cafesjian and Waters, we find no error in the District Court's resolution of their breach-of-fiduciary-duty claims.

## III.

Much of Appellants' focus on appeal—indeed, much of the parties' overall focus throughout this litigation—has been trained on the Grant Agreement's reversion clause. Because AGM&M failed to develop (or at least "substantially develop") the museum by December 2010, the District Court concluded that the Grant Agreement provided Cafesjian and CFF the right to seek transfer of the properties granted to AGM&M for the museum's use. *See Armenian Assembly of Am.*, 772 F. Supp. 2d at 121-22. From Appellants' perspective, the District Court wrongly enforced and interpreted the reversion clause. Although they advance a multitude of arguments on this issue, we find none availing and only two worthy of any detailed discussion.[9]

*First*, Appellants contest the enforceability of the reversion clause as a general matter. They argue that the District Court should have exercised its equitable powers to either toll the reversion deadline, or deem the reversion clause unenforceable altogether, based on the prevention doctrine. In their view, because Cafesjian's actions were the very reason AGM&M could not develop the museum by the end of 2010, equity should not permit him to benefit from AGM&M's failure to meet that deadline.

---

[9] We recognize that some uncertainty arose in the District Court as to whether this provision truly describes "reversion" rights, rather than "transfer" rights—insofar as the properties were originally held by TomKat, and not Cafesjian or CFF directly, and thus would not truly "revert" to Cafesjian or CFF in the event the provision were triggered. Without expressing any opinion on the legal consequences of the label, we adopt the term "reversion clause" for simplicity's sake, only because the parties have used that moniker throughout the litigation.

To be sure, the District of Columbia does recognize the prevention doctrine, which stands for the proposition that if one contracting party's actions are the cause for another party's failure to satisfy a condition in the contract, "he cannot take advantage of the failure." *In re Estate of Drake*, 4 A.3d 450, 454 (D.C. 2010) (internal citation omitted); *see also Aronoff v. Lenkin Co.*, 618 A.2d 669, 682 (D.C. 1992) ("Prevention . . . can negate a requirement to satisfy a condition precedent."); 13 WILLISTON ON CONTRACTS § 39:3, at 569 (4th ed. 2013) ("It is a general principle of contract law that if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused."). The trouble with Appellants' prevention theory, however, is that it is undercut by the District Court's factual findings. As the District Court interpreted the evidence below, it was the "lack of funding" that caused AGM&M to put the brakes on the museum project, "and the record [did] not clearly show that any actions by Cafesjian . . . caused AGM&M to lose donors." *Armenian Assembly of Am.*, 772 F. Supp. 2d at 116; *see also id.* ("Plaintiffs blame Cafesjian . . . for their inability to fundraise, but that claim is speculative."). And, as we have already noted, the District Court found that prospective donors may have chosen to delay their contributions because of the litigation brought by both of the contracting parties. Thus, even if Cafesjian did truly interfere with the museum's progress, as Appellants insist, the District Court's findings confirm that any such actions were not the cause of AGM&M's inability to substantially complete the museum by December 2010.

In an effort to escape this outcome, Appellants also contend that the District Court's factual findings are immaterial because it applied the wrong legal standard for causation in the first place. They argue that Cafesjian's

actions need only have been "fairly attributable" to AGM&M's failure to meet the reversion clause's deadline, and not necessarily the "but-for" cause, as the District Court supposedly surmised. We decline to entertain this argument because—as was an unfortunate theme in these appeals—it was not raised by Appellants until reply. *See, e.g.*, *S. Coast Air Quality Mgmt. Dist. v. EPA*, 554 F.3d 1076, 1081 n.* (D.C. Cir. 2009) ("[I]n order to prevent sandbagging of appellees and respondents, we do not consider arguments that were raised neither in the opening brief nor by respondents.") (internal citation and quotation marks omitted).

*Second*, Appellants argue that, even if the reversion clause is valid and enforceable as a general matter, the District Court was wrong to allow CFF to take the properties in full—particularly the Bank Building, since nearly half of the funds used for its original purchase were provided by neither CFF nor Cafesjian. Instead, Appellants urge, the language of the Grant Agreement only allows "Cafejsian to recoup what he contributed to the project"—*i.e.*, a percentage share of the Bank Building. Appellants' Reply Br. at 15. This argument hinges on three words used in the reversion clause: "*to the degree* any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property." J.A. 463 (§ 3.1(B)(ii)) (emphasis added). Appellants claim that, by inserting the phrase "to the degree," the parties unambiguously signified that any potential reversion—whether of funds or of property—would be proportionate to the amount of CFF's and Cafesjian's contributions. *See* Appellants' Reply Br. at 17 ("In other words, Cafesjian could elect to recoup the Grant funds 'to the degree' he had actually provided them or require the Assembly to transfer the Grant Property 'to the degree' that he had provided funds to purchase it."). We, like the

District Court, think this argument boils down to a "straightforward question of contract interpretation." *Armenian Assembly of Am.*, 772 F. Supp. 2d at 144.

The District of Columbia follows the "'objective' law of contracts, which generally means that 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.'" *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003) (quoting *Geiger v. Crestar Bank*, 778 A.2d 1085, 1091 (D.C. 2001)) (alteration in original). Our initial task, then, is to determine whether the disputed language is unambiguous. If so, we rely strictly on the terms of the contract in ascertaining the parties' intended meaning, eschewing extrinsic evidence. *See Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1171, 1178 (D.C. 2006). If, on the other hand, we find that "the contract has more than one reasonable interpretation and therefore is ambiguous," then we must consider extrinsic evidence to "determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Id.* at 1176. The question of a contract's ambiguity *vel non* is one we review *de novo*. *See Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007).

At first blush, there is some facial appeal to Appellants' proffered interpretation of the reversion clause. After all, the ordinary meaning of the word "degree" denotes some measure of proportionality. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 594 (3d ed. 1981) ("degree": "the extent, measure, or scope of an action, condition, or relation"); THE NEW OXFORD AMERICAN DICTIONARY 446 (2d

ed. 2005) ("degree": "the amount, level, or extent to which something happens or is present"). Given this, we agree that the terms of the reversion clause do unambiguously contemplate the possibility of some sort of partial reversion, depending on the "degree" to which the Grants had been funded at the time of reversion. But looking to the plain language of the Grant Agreement—in particular, the contract's own definitions of the terms "Grants" and "Grant Property"—the contract is equally unambiguous in confirming that any such partial reversion would not be measured in the sense Appellants urge.

The capitalized term "Grants" carries the same meaning in the reversion clause as it does elsewhere in the Grant Agreement—that is, the "Grants" identified are the combination of the "First Grant" and the "Second Grant," as defined by the contract. The "First Grant" is itself defined as the total amount CFF and Cafesjian donated for the acquisition of the Bank Building (and an additional amount to be used toward the creation of a memorial), and the "Second Grant" is defined as the total amount CFF and Cafesjian provided to purchase the Adjacent Properties. J.A. 461-63 (§§ 1.1-1.3, 2.1-2.3). In other words, the "Grants" referred to in the Grant Agreement are already limited to the universe of funds contributed by CFF or Cafesjian. Determining the "degree" to which the "Grants" had been funded, therefore, entails no consideration of the *overall* amount of funds used to acquire the Bank Building, regardless of the source, as Appellants' argument presupposes. Appellants' Reply Br. at 17 ("[H]e could have demanded the Grant Property 'to the degree' that he had funded its purchase: $3.5 million of the [total] $7.25 million purchase price of the Bank Building."). Instead, one would look solely to the degree that CFF and Cafesjian had funded the "Grants" specified and enumerated within the Grant Agreement. And so long as those amounts

were fully funded at the time of the reversion, any resultant acquisition of the Grant Property under the reversion clause would be unrestricted. (We note that this interpretation refutes Appellants' contention that their reading of the reversion clause is the only interpretation that would give meaning to the phrase "to the degree.")

Equally unhelpful to Appellants' proffered reading, we think, is the contract's definition of the term "Grant Property," which is identified as the "First Grant Property" and the "Second Grant Properties," together. The "Second Grant Properties" are made up of the Adjacent Properties ("1334-36, 1338, 1340, and 1342 G Street N.W."), while the "First Grant Property" is defined—quite importantly for purposes of this discussion—as the *entirety* of the Bank Building: "the property at 14th and G Streets, N.W., Washington, D.C., known as the National Bank of Washington Building." J.A. 461-62 (§§ 1.2, 2.2). Had the parties sought to somehow delimit CFF's and Cafesjian's rights to obtain a reversion of the Bank Building, one approach might have been to define the "First Grant Property" as a partial interest in the Bank Building proportionate to CFF's and Cafesjian's relative contributions, or something to that effect. Yet no such limitation appears in the Grant Agreement.

With this understanding of the reversion clause in mind, we conclude that, because the Grants were fully funded at the time CFF exercised its reversionary rights, the District Court correctly determined that CFF was entitled to take the "Grant Property" in full, without any limitation or setoff. At the time of oral argument, there was some uncertainty as to the timing of a final balloon payment for the property at 1340 G Street N.W.; the parties' supplemental filings, however, confirmed that this final payment was indisputably made before the

District Court's May 2011 decision, when the court resolved the scope of CFF's reversion rights and ordered the transfer of the Grant Property in full. Thus, the Grants were fully funded by the time of the reversion. Furthermore, even if the operative date by which the Grants must have been funded was December 31, 2010—as Appellants' counsel suggested at argument—we would still see no basis to require a partial reversion due solely to the timing of the final balloon payment. The parties anticipated, at the time they signed the Grant Agreement, that the final payment for 1340 G Street would be paid in March 2011, which means they knew full well that the final payment would come due after December 31, 2010. *See* J.A. 241-42 (Undisputed Facts, ¶ 39). The only way to give meaning to the term "funded" in the Grant Agreement is to understand that the parties anticipated this final payment, if timely tendered, would constitute full funding of the Grants within the meaning of the contract.

We recognize that Appellants put forth a variety of extrinsic evidence to support their interpretation—evidence surrounding the parties' drafting history, supposedly helpful trial testimony, and more. Setting aside the fact that these arguments essentially surface for the first time in Appellants' reply brief, we have no occasion to consider their extrinsic evidence because the language of the reversion clause is unambiguous on this point. *Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564, 570 (D.C. 2000) ("[U]nder no circumstances will extrinsic evidence be admissible to reveal the subjective intent of a party to a contract unambiguous on its face.").

In sum, the terms of the Grant Agreement's reversion clause are unambiguous. In the event the museum project was not substantially completed by December 2010, CFF (and Cafesjian) held the contractual right to seek either the

return of the Grant funds or the transfer of the Grant Property. And so long as the Grants promised by CFF and Cafesjian were fully funded at the time, those rights were without limitation or setoff, whether based on the parties' share of the contributions on the front end, the properties' appreciated value at the time of reversion, or otherwise. With the benefit of hindsight, Appellants may now think this deal improvident, but no sense of buyer's remorse can empower us to rewrite the plain terms of the contract to which they agreed.[10]

## IV.

One set of claims was found proven below: Cafesjian's and Waters' claims for indemnification against AGM&M. Under the AGM&M bylaws, the District Court held, both Cafesjian and Waters were entitled to indemnification from the corporation for expenses associated with defending against AGM&M's claims for breach of fiduciary duty, given that those expenses were incurred because of their roles as trustees and officers of AGM&M. In decrying this ruling, Appellants advance two lines of argument, one broader and one more targeted. On a broader level, they argue that any award of indemnification was improper on these facts because Cafesjian, proverbially speaking, fired the first shot, suing AGM&M first. As for the specifics of the District Court's award, Appellants insist that even if some degree of indemnification is appropriate, the amount awarded below was unreasonable. We reject both contentions.

---

[10] Just as they did below, Appellants also advance a hodgepodge of tax-focused arguments in arguing that the reversion clause cannot be enforced as written. We reject these arguments for the reasons stated by the District Court. *Armenian Assembly of Am.*, 772 F. Supp. 2d at 147-50.

*First,* Appellants contend that indemnification is improper altogether because the claims for breach of fiduciary duty that AGM&M advanced were merely responsive to the litigation initiated in the first place by Cafesjian. In their view, because Cafesjian "started this case," the resultant legal expenses are a "self-inflicted wound," Appellants' Br. at 62-63, which means that neither Cafesjian nor Waters can seek indemnification associated with any claims that grew out of the litigation. We are not persuaded.

The issue of indemnification in this case is governed by the AGM&M bylaws. The bylaws provide, in relevant part, that "the Corporation *shall indemnify* . . . any former Trustee or officer of the Corporation . . . against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding . . . in which he or she is . . . made a party by reason of having been such Trustee [or] officer." J.A. 498 (§ 4.1) (emphasis added). The only carve-out from mandatory indemnification occurs if the trustee or officer is found "guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation." *Id.* Given our earlier analysis, this solitary exception finds no application here. And otherwise, the bylaws do not draw any distinction between legal expenses incurred in a purely defensive litigation capacity, and those incurred in defending against claims filed only after the trustee or officer first brought suit against the organization. Nor do we perceive any other basis to draw such a distinction. Irrespective of how these lawsuits originally began, the fact remains that AGM&M chose to assert (rather wide-reaching) claims against Cafsejian and Waters for breach of fiduciary duty, and the fact remains that Cafesjian and Waters were

required to mount a defense to those claims. The legal fees associated with their defense were thus "actually and necessarily" incurred "in connection with" claims arising out of their service as trustees or officers of AGM&M, and are therefore subject to indemnification under the bylaws. J.A. 498. Appellants' effort to escape liability by focusing on Cafesjian's plaintiff status in the first-filed lawsuit simply finds no support in the law. *See* 3A FLETCHER CYC. CORP. § 1344, at 590-91 (2011 rev'd volume) ("Indemnification may even be available where the director is the plaintiff in the litigation."). As such, the District Court rightly found that some measure of indemnification in favor of Cafesjian and Waters was proper, at least with respect to their defense of AGM&M's claims for breach of fiduciary duty.[11]

*Second*, Appellants contest the amount of the District Court's indemnification award as excessive. "[T]he determination of a reasonable fee award is for the trial court in light of the relevant circumstances," and we review that determination "only for abuse of discretion." *Ideal Elec. Sec. Co., Inc. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 150 (D.C. Cir. 1997). Although Appellants' specific arguments take several forms, the overarching theme is that the District Court failed to ensure the fees awarded were "reasonable." Our review of the record leads us to the opposite conclusion.

---

[11] Relatedly, Appellants assert that AGM&M became a private foundation, and that indemnification in these circumstances is forbidden under its bylaws as an act of self-dealing. We reject this argument for the reasons given below. Even if the IRS had made a determination that AGM&M was a private foundation, Treasury regulations exclude the indemnification of former officers from the ambit of self-dealing. *See Armenian Assembly of Am.*, 772 F. Supp. 2d at 151-52 (citing 26 C.F.R. § 53.4941(d)-2(f)(3)).

To begin with, Appellants are correct that courts are "'obliged under District law to award only *reasonable* fees,'" *Ideal Elec. Sec. Co.*, 129 F.3d at 150 (quoting *F.D.I.C. v. Bender*, 127 F.3d 58, 63 (D.C. Cir. 1997)) (emphasis added), and we agree that this holds true whether attorneys' fees are awarded under a fee-shifting statute or pursuant to a contractual indemnification provision (as here). Given this, we reject at the outset Appellees' argument that, simply because the AGM&M bylaws do not explicitly limit a covered indemnification award to one that is "reasonable," no such limitation applied. Irrespective of the specific language used in the bylaws, District of Columbia law requires that a fee award be reasonable. That said—and despite Appellants' complaints to the contrary—we are satisfied that the District Court made this necessary determination here, "ensuring the overall award [was] reasonable." *Armenian Assembly of Am.*, 924 F. Supp. 2d at 208.

In arguing otherwise, Appellants principally fault the District Court for opting not to apply the *Laffey* matrix. *See* Appellants' Supp. Br. at 12-15. This contention misses the mark. We certainly have approved of the *Laffey* matrix as a useful tool in assessing reasonableness in some circumstances. *See, e.g.*, *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). But so far as we can tell, we have never employed the matrix, nor have we explicitly affirmed its use, in a suit exclusively between private parties.[12] And more importantly in any event, as we made clear in *Bender*, for fees awarded pursuant to contractual provisions under D.C. law, the discretion imbued

---

[12] We realize, however, that the District of Columbia Court of Appeals has affirmed a lower court's reliance on the *Laffey* matrix in such a case. *See Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 947-48 (D.C. 2012).

in the trial court in adjudging the reasonableness of a fee award includes the ability to decide for itself "the nature and amount of proof necessary to determine reasonableness." *Bender*, 127 F.3d at 64. That is, "the trial judge decides what sort of proof, *if any*, is needed to determine what a reasonable fee would be in any individual case"; in fact, we have gone so far as to recognize that "a judge who has monitored the case from its inception . . . can fix the amount of the fee *without hearing any evidence at all*." *Id.* (emphases added). Faced with our precedent on these points, Appellants' weighty reliance on the District Court's disregard for the *Laffey* matrix gets them nowhere.

Otherwise, Appellants take particular issue with the portion of the District Court's indemnification award for "blended" entries—that is, time entries that are partially, but not exclusively, attributable to the defense of AGM&M's fiduciary-duty claims. They first insist that any degree of indemnification for "blended" entries is impermissible, but this argument is quickly dispelled by the Supreme Court's decision in *Hensley v. Eckherhart*, 461 U.S. 424 (1983), which recognized that, where a party is entitled to a fee award for only some of the claims involved in the litigation, "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 435-37. Appellants also fault the 50% benchmark used to account for these blended entries, but we perceive no abuse of discretion in the adoption of this rate, which the District Court characterized as "an optimum and reasonable percentage." J.A. 1555; *see also Armenian Assembly of Am.*, 924 F. Supp. 2d at 209-10 (adopting recommendation).

In sum, the District Court made a determination that the indemnification award was reasonable, and, contrary to

Appellants' standpoint, it was not required to adhere to any particular method in doing so. We have considered their arguments, and we find no basis to disturb the indemnification award.

**V.**

Appellants' final challenges on appeal relate to two post-trial motions filed with and rejected by the District Court. Through the first, Appellants sought a new trial based on the District Judge's alleged conflict of interest in these proceedings. Invoking the standards set forth in 28 U.S.C. § 455, Appellants specifically argued that the judge was biased in favor of Cafesjian because the two had been donors (along with others) of a glass sculpture to the Metropolitan Museum of Art years prior, and because they supposedly otherwise shared a general interest in fine glass art, especially sculptures created by a particular artist, Stanislav Libensky. The District Court turned aside this challenge, finding it not only procedurally infirm, but also unfounded on the merits. We agree with the District Court that no reasonable observer would question a judge's impartiality based on these circumstances, 28 U.S.C. § 455(a), and we also agree that the trial judge's artistic interests could not have been substantially affected by the case's outcome, *id.* § 455(b)(5)(iii). *See Armenian Assembly of Am.*, 783 F. Supp. 2d at 87-93; *cf. McCann v. Commc'ns Design Corp.*, 775 F. Supp. 1535, 1543 (D. Conn. 1991) (Cabranes, J.) (denying recusal under § 455 where judge was a Yale trustee and judge's wife was a Yale professor and parent company of defendant had previously made financial contributions to Yale).

Appellants' second new-trial motion averred that certain late-breaking developments revealed an undiscovered financial bent in this litigation on Waters' part. Underlying

this motion was a lawsuit Waters filed against Cafesjian in March 2012, alleging (among other claims) that Cafesjian failed to pay him a "special bonus" supposedly promised "in the event of a positive outcome in the AGM&M litigation." J.A. 1581. These facts, Appellants surmised, undermined Waters' credibility and would have impacted the District Court's view of the claims litigated at trial, particularly the claims for breach of fiduciary duty.[13] The District Court disagreed, denying the motion under Federal Rule 60(b). We review that decision for abuse of discretion, *Summers v. Howard Univ.*, 374 F.3d 1188, 1192 (D.C. Cir. 2004), and we uncover none here.

We have said before that, to secure relief under Rule 60(b), a litigant must establish not only that one of the rule's

---

[13] Appellants additionally bring to our attention that, in August 2013, Waters was indicted by the U.S. Attorney for the District of Minnesota on 26 counts of mail and wire fraud, income tax evasion, and other charges, relating to his alleged embezzlement of millions of dollars from Cafesjian and CFF. *See* Appellants' Supp. Br. at 7. We note further that a jury has since convicted Waters on all but one of those counts. *See United States v. Waters*, No. 13-cr-203, Jury Verdict (Dkt. No. 93) (D. Minn. Mar. 5, 2014). Aside from a passing reference to these developments, however, Appellants do not even attempt to explain how Waters' indictment would have justified a new trial under Rule 60(b). As best we can discern, the only conceivable import of this information might relate to Waters' indemnification rights under the AGM&M bylaws (as he was found "guilty of a criminal offense," J.A. 498), but Appellants do not press this argument. And even if they did make such an argument, the theory strikes us as a non-starter in any event because Waters' wrongdoing involved funds supposedly siphoned away from CFF and Cafesjian, not AGM&M. *See id.*, Redacted Indictment (Dkt. No. 92) (D. Minn. Mar. 5, 2014). So while Waters' criminal troubles are certainly an interesting development, they have no bearing on our resolution of these appeals.

enumerated grounds for relief is satisfied, but also some "actual prejudice" flowing from the supposed misconduct or other circumstances claimed to warrant relief. *Summers*, 374 F.3d at 1193; *accord In re Hope 7 Monroe St. Ltd. P'ship*, 743 F.3d 867, 875 (D.C. Cir. 2014) (reiterating that a movant must show it was foreclosed from making a "full and fair preparation or presentation of its case"). Appellants cannot identify any such prejudice here. In resolving Appellants' Rule 60(b) motion, the District Court explained that it did not rely on Waters' credibility in rendering its decision at trial. Instead, the District Court explained, it grounded its decision as much as possible on documentary evidence, rather than the testimony of witnesses, given that most of the witnesses had some personal stake in the outcome of the trial. *Armenian Assembly of Am.*, 924 F. Supp. 2d at 195. Even more to the point, the District Court explicitly stated that it "analyzed the initial trial record knowing that Waters had a personal financial stake in the outcome of the case." *Id.* at 196. Appellants do not identify even a single instance in which the District Court credited Waters' testimony over the testimony of their witnesses, nor do they point to any aspect of the decision below that signals any sort of meaningful reliance on Waters' credibility. Simply put, the District Court reasonably explained that the newly surfaced allegations surrounding an undisclosed financial arrangement between Waters and Cafesjian would not have altered its findings. That ruling can hardly be characterized as an abuse of discretion.[14]

---

[14]  We also believe the District Court acted well within its discretion insofar as it denied the Rule 60(b) motion on the grounds that the only form of "evidence" Appellants presented to support this theory consisted of allegations in Waters' unverified complaint, which, of course, are not evidence at all. *See Coward v. ADT Sec. Sys., Inc.*, 194 F.3d 155, 161 (D.C. Cir. 1999) (Williams, J., concurring in part and dissenting in part) ("[A]llegations are notoriously not evidence.").

## VI.

Appellants raised the lion's share of issues joined for our review on appeal; thus far, we have focused on their arguments, and we reject them for the reasons stated. But Appellees, for their part, also elected to cross-appeal the District Court's ruling concerning the Assembly's lease of space in one of the Adjacent Properties—the "Families USA building," located at 1334-36 G Street N.W. Dissatisfied with the District Court's determination that the Assembly's lease was and remains valid, Appellees make several arguments in urging reversal. We are not persuaded.

*First*, Appellees argue that the Assembly's lease, which was originally executed in May 2009, was invalid from the get-go. This is so, they say, because the lease's purpose did not adhere to the limited property uses permitted under the Grant Agreement. This argument turns on Appellees' contention that AGM&M's lease of space, even if designed to generate revenue for the museum's development, cannot be considered a property use that is "part of" the museum project, as specified in the Grant Agreement. *See* J.A. 463 (§ 3.1(A)). Said differently, we understand their theory to be that AGM&M, in leasing the property to the Assembly, exceeded the power authorized it under the Grant Agreement. Under District of Columbia law, it is Appellees' burden, as the parties challenging a corporate act, to show that AGM&M acted beyond the scope of its authority. *See Green Leaves Rest., Inc. v. 617 H St. Assocs.*, 974 A.2d 222, 230 (D.C. 2009); *Hodge v. Evans Fin. Corp.*, 823 F.2d 559, 568 (D.C. Cir. 1987) (applying D.C. law). And in striving to do so here, they seem to suggest that the only way the property could be used "as part of" the museum project—and thus remain faithful to the Grant Agreement—is if the property physically

housed some portion of the museum's structure or grounds; an ancillary use of the property for fundraising purposes, Appellees suggest, cannot suffice. We reject this restrictive reading. The plain language of the Grant Agreement provision on which they rely does not foreclose a lease of one of the Adjacent Properties to raise funds for the museum project, as the District Court found was AGM&M's purpose here. *Armenian Assembly of Am.*, 772 F. Supp. 2d at 101 ("The Building & Operations Committee also tried to raise funds by leasing space in the Families U.S.A. building."). Appellees thus fall short of their burden to show that AGM&M exceeded its authority in entering into the lease.

*Second,* and relatedly, Appellees contend that AGM&M's lease agreement with the Assembly was *ultra vires* because it was never properly approved by AGM&M. We think this argument squarely foreclosed by the District Court's factual findings. *Id.* at 125 ("[T]he record shows that the Assembly's lease in the Families U.S.A. building was approved by the Building and Operations Committee, which was delegated authority to manage the Properties by the AGM&M Board."). Appellees point to nothing in the record that would cause us to upend these findings as clear error.

*Third*, Appellees argue that, even if it was proper for AGM&M to lease the Families USA building to the Assembly in the first place, the District Court was wrong in not applying equitable remedies to void the Assembly's continued lease after the property was transferred to CFF per the reversion clause. We see two problems with this theory. For one, as Appellants note, it seems Appellees failed to advance these equitable arguments in the District Court and thus now face a forfeiture problem. *Byers*, 740 F.3d at 681; *Figueroa*, 633 F.3d at 1133 n.3. Appellees insist otherwise, but the generic and cursory references they point to in their

filing below—for instance, asking the court to "alter, amend, or make additional legal, *equitable*, and/or factual rulings" concerning its decision on the lease, *see* Appellees' Reply Br. at 17 (emphasis in original)—are a far cry from properly pressing their equitable arguments at the trial-court level. Additionally, even if these theories are not deemed forfeited *per se*, our review of the District Court's application of equitable principles is for abuse of discretion, *see Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004), and we identify none, particularly since the briefing below never truly afforded the District Court the chance to pass on these arguments in the first place.

Based on the foregoing, we reject the notion that the Assembly's lease in the Families USA building is invalid.

## VII.

This legal saga has been long-lived. What began as a single lawsuit to collect on an unpaid promissory note quickly escalated into a morass of litigation. More than seven years and millions of dollars in legal fees later, much of the parties' work to achieve their dream of a museum appears to have been for naught, which is regrettable. Whatever happens next, hopefully our decision today can at least serve as the last word on this dispute's protracted journey through the courts.

For our part, we have considered all of the parties' arguments. The judgment and post-judgment rulings of the District Court are affirmed.

*So ordered.*