Concurring opinion filed by Circuit Judge WILKINS.
Dissenting opinion filed by Circuit Judge BROWN.
EDWARDS, Senior Circuit Judge:
In 1999, a class of Native American farmers and ranchers filed suit against the United States Department of Agriculture (“the Department”), contending that the Department discriminated against Native American applicants in their claims under farm credit and benefits programs. After more than a decade of contentious litigation, the District Court approved a Settlement Agreement (“the Agreement”) in 2011 that created a $680 million compensation fund for the benefit of class members who participated in a non-judicial, administrative claims process.
At the conclusion of the claims process, $380 million still remained in the compensation fund. Under the terms of the Agreement, any leftover funds were to be distributed to cy-pres beneficiaries—i.e., nonprofit organizations that provided services to Native American farmers. Because the parties had not anticipated such a large remainder, they entered into negotiations to modify the Agreement. The parties’ initial attempt at modification was unsuccessful. However, a second effort resulted in an addendum to the Agreement that is the subject of the dispute in this case. Under the terms of the addendum, the cy-pres process would be reformed to distribute funds more efficiently and supplemental payments would be awarded to class members who had successfully recovered from the compensation fund.
The District Court approved the addendum to the Agreement, concluding that it was “fair, reasonable, and adequate” under Federal Rule of Civil Procedure 23(e)(2) (“Rule 23”). The District Court found that the addendum reflected a compromise between two competing goals: paying out more funds to claimants who successfully recovered through the claims process, and maintaining the cy-pres distributions for the benefit of the class as a whole.
Two class members—class representative Keith Mandan (“Appellant Mandan”) and class member Donivon Craig Tingle (“Appellant Tingle”)—appealed to this court, raising four principal arguments. First, Appellant Mandan claims that under the Agreement’s modification clause, the proposed addendum cannot be approved without his assent. Second, Appellant Man-dan disputes that the addendum is “fair, reasonable, and adequate.” Third, Appellant Mandan asserts that the cy-pres provision of the Agreement is unconstitutional, in violation of the Appropriations Clause, and unlawful under the Judgment Fund Act. Fourth, Appellant Tingle alleges that class counsel and class representatives breached their fiduciáry duties to class members. Both Appellants, who successfully obtained payments through the claims process, contend that all of the $380 million still remaining in the compensation fund should be distributed pro rata to the successful claimants.
*1043 We affirm the judgment of the District Court. We reject the claim that the modification clause requires Appellant Mandan’s assent before the Agreement can be amended. We further hold that the District Court did not abuse its discretion in finding that the addendum was fair, reasonable, and adequate. We decline to reach the merits of Appellant Mandan’s legal challenges to the cy-pres provision because these claims were explicitly waived before the District Court. The claims were also forfeited because Appellant Mandan never raised any legal challenges to the cy-pres provision before the District Court despite clear opportunities to do so. And there are no good reasons at this late date in the litigation for this court to entertain Appellant Mandan’s legal challenges to the cy-pres provisions in the first instance. Finally, we find no merit in Appellant Tingle’s breach of fiduciary duty claims.
I. Background
In 1999, over two hundred Native American farmers and ranchers filed a class-action suit against the United States Department of Agriculture, contending that the Department discriminated against Native American applicants in their claims for credit and benefits under various government programs. Plaintiffs alleged violations of the Equal Credit Opportunity Act, the Administrative Procedure Act, and Title VI of the Civil Rights Act of 1964. In 2001, the District Court found that the plaintiffs had satisfied the requirements of Rule 23(b)(2), and certified a class of
[a]ll Native-American farmers and ranchers, who (1) farmed or ranched between January 1, 1981 and November 24, 1999; (2) applied to the [the Department] for participation in a farm program during that time period; and (3) filed a discrimination complaint with the [the Department] individually or through a representative during the time period.
Keepseagle v. Veneman, No. 99-cv-3119, 2001 WL 34676944, at *6 (D.D.C. Dec. 12, 2001). The District Court declined to decide whether certification under Rule 23(b)(3), for monetary relief, was appropriate at the time. Id. at *14. However, the court noted that it “maintain[ed] the power to revisit the definition of the class at any point.” Id.

A. The Initial Settlement

After more than a decade of extensive discovery practice, the parties reached agreement in 2010 and drew up a settlement agreement for the District Court’s approval. See Motion for Preliminary Approval of Settlement, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Oct. 22, 2010), ECF No. 571. The proposed Settlement Agreement provided both programmatic and monetary relief. See Settlement Agreement §§ IX, XII, Judicial Appendix (“JA”) 405-23, 424-29. The programmatic relief included establishing the Council for Native American Farming and Ranching, requiring the Department to collect and evaluate data pertaining to its Farm Loan Program, and enhancing services and education for-Native American farmers and ranchers. Id. § XII, JA 424-29. To provide monetary relief, the Agreement sought certification of a Rule 23(b)(3) opt-out class. Id. § IV(A), JA 400. The Agreement established a $680 million compensation fund financed by the Department of the Treasury. Id. § VII(F), JA 403. Under an administrative claims process set forth in the Settlement Agreement, claimants would receive either $50,000, if they had “substantial evidence” of certain circumstances required in the Agreement, or up to $250,000, if they met a higher evidentia-ry standard. See id. § II(SS), (W), JA 398 (setting out the dollar amounts of awards); § IX, JA 405-23 (outlining the non-judicial claims process). Claimants were given 180 days from the effective date of the agree *1044 ment to submit their claims. Id. § 11(B), JA 392. Some funds were also allocated to the named class representatives as “service awards.” Id. § XV(C), JA 433-34.
In the event that the $680 million compensation fund was not exhausted during the claims process, the Agreement contained a cy-pres provision. Id. § IX(F)(7), JA 422-23. That provision created a “Cy Pres Fund,” defined as “a fund administered by Class Counsel designated to hold any leftover funds” from the claims process. Id. § II(J), JA 393. The Cy Pres Fund was to be distributed in equal shares to cy-pres beneficiaries designated by class counsel. Id. § IX(F)(7), JA 422-23. The Agreement limited cy-pres beneficiaries to “any non-profit organization, other than a law firm, legal services entity, or educational institution” that served Native American farmers. Id. § II(I), JA 393.
The Agreement also contained a provision permitting modification of the settlement, but “only with the written agreement of the Parties and with the approval of the District Court, upon such notice to the Class, if any, as the District Court may require.” Id. § XXII, JA 438. The Agreement defined “Parties” as “the Plaintiffs and the Secretary,” and “Plaintiffs” as “the individual plaintiffs named in Keepseagle v. Vilsack, ... the members of the Class, and the Class Representatives.” Id. § II(DD), (EE), JA 396.
The District Court received thirty-five letters objecting to the proposed Agreement. See Notice of Filing Objections and Opt Out Requests, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Mar. 18, 2011), ECF No. 585. Neither Appellant Mandan nor Appellant Tingle submitted objections. Three letters related to the Cy Pres Fund: one objector offered up organizations he had started as potential cy-pres beneficiaries, id. .at Exhibit 2; another recommended that cy-pres awards be used for outreach to farmers, id. at Exhibit 33; a third cautioned that it was “simply wrong” to distribute remaining funds to cy-pres beneficiaries “as determined by class counsel,” id. at Exhibit 32.
Class counsel responded to the objections in a motion seeking final approval of the settlement, and the District Court held a fairness hearing on April 28, 2011. The District Court found that the terms of the settlement were fair and reasonable and adequate pursuant to Rule 23(e), and approved the Agreement. See Order, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Apr. 28, 2011), JA 589-91. The District Court entered final judgment dismissing the case, but retained continuing jurisdiction for five years for the limited purposes of overseeing compliance with the programmatic relief and the administrative claims process. See Final Order and Judgment, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Apr. 29, 2011), JA 592-93. No party appealed from the District Court’s final order.
The administrative claims process proved to be less than satisfactory. Far fewer people made claims than anticipated. At the conclusion of the claims process, only $300 million of the $680 million settlement fund had been paid out. Although the Agreement originally directed the remaining $380 million to be distributed to cy-pres beneficiaries, class counsel informed the District Court that such a large cy-pres disbursement was “not contemplate[d]” by the original Agreement and would be “impractical.” Status Report at 4-5, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Aug. 30, 2013), ECF No. 646. The parties agreed to confer over possible solutions.
B. The First Modification Attempt
In September 2014, class counsel filed an unopposed motion to modify the Settlement Agreement, citing Rule 60(b)(5) and *1045 the modification clause of the Agreement. See Plaintiffs’ Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Sept. 24, 2014), ECF No. 709. Counsel proposed to act promptly to distribute $38 million of the leftover funds to non-profit organizations, and to use the remaining $342 million to create a trust that would distribute the latter sum, over 20 years, to non-profit organizations serving Native Americans. While class counsel and the Department agreed to the proposed modification, one of the class representatives—Marilyn Keepseagle—did not, and filed her own motion to modify the settlement. See Marilyn and George Keep-seagle’s Motion to Modify the Settlement Agreement, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. May 19, 2015), ECF No. 779. Keepseagle proposed a pro rata distribution of the leftover funds to the successful claimants—a supplemental payment of around $100,000 each. The District Court held a hearing at which many class members testified in support of Keepsea-gle’s proposal. Neither Appellant Tingle nor Appellant Mandan testified.
The District Court denied both class counsel and Keepseagle’s motions to modify. See Keepseagle v. Vilsack, 118 F.Supp.3d 98 (D.D.C. 2015), JA 1098-1167 (“First Modification Decision”). The court found that neither class counsel nor Keep-seagle had met the requirements of Rule 60, in part because, in the court’s view, the larger-than-expected remaining funds did not constitute “truly changed circumstances” warranting relief. Id. at 55-62, JA 1152-59. The court also found that class counsel’s motion did not have the “agreement of the Parties,” as required by the modification clause, because Keepseagle, a class representative, opposed the motion. Id. at 67-68, JA 1164-65. The District Court implored all parties to continue negotiating. Id. at 69, JA 1166.
C. The Second Modifícation Attempt
Class counsel, the Department, and Keepseagle reached a compromise in December 2015, and submitted a motion to amend the Agreement pursuant to the modification clause. See Plaintiffs’ Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Dec. 14, 2015), ECF No. 824. The proposed compromise provided for an additional $18,500 payment to each of the 3,605 successful claimants and a corresponding payment to the Internal Revenue Service on each claimant’s behalf. See Memorandum Opinion at 8, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Apr. 20, 2016), JA 1454 (“Second Modification Decision”). Then, $38 million would be .promptly distributed to nonprofit organizations proposed by class counsel and approved by the District Court. After the named representatives received additional “service awards” for their work in negotiations, the remaining funds (estimated to be $265 million) would be placed in a trust, to be paid out over twenty years, as contemplated by class counsel’s previous motion.
The District Court directed class counsel to provide notice of the proposed modification to the class, reviewed written comments from class members, and held a hearing on February 4, 2016, at which many class members testified. Appellant Tingle wrote in opposition, claiming that the trustees of the proposed trust would enrich themselves instead of benefiting class members. See Letter from D. Craig Tingle (Jan. 4, 2016), JA 1201-02. Appellant Mandan also filed a letter with the District Court, arguing that the remaining funds should all go to successful claimants, who are “easily identifiable,” and not to “third parties who have not suffered any injury and who have no claims against the United States.” See Comments of Class *1046 Representative Keith Mandan (Jan. 20, 2016), JA 1197-99. Appellant Mandan also filed a separate submission arguing that the District Court could not approve the proposed modification without his assent, because the modification clause requires the “agreement of the Parties.” Points and Authorities of Law at 1, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Feb. 11, 2016), ECF No. 851. Appellant Mandaris objection cited the District Court’s decision rejecting the first proposed modification and claimed that his objection presented “the same issue” as Keepseagle’s objection. Id. at 3.
Counsel for Appellant Mandan, and Appellant Mandan himself, testified in support of fully distributing the remaining funds to successful claimants. See Tr. of Mot. Hr’g Proceedings at 68-74, 175, JA 1270-76, 1377. At the February 4, 2016 hearing, District Court Judge Sullivan, who had been presiding over the case, asked Appellant Mandan’s counsel about a separate lawsuit that he had filed on behalf of a different class member, William Smallwood. Id. at 21, JA 1223. Judge Sullivan noted that three days earlier, on February 1, 2016, Appellant Mandan’s counsel had filed a complaint in the District Court challenging the legality of the proposed cy-pres distribution. Id. Judge Sullivan stated that the complaint was initially marked as “related” to the Keepseagle proceeding, but had been reassigned to Judge Walton because the complaint challenged the initial settlement agreement, the merits of which were resolved in 2011. Id. at 21-22, JA 1223-24.
Even though the matter had not been raised in the Keepseagle proceeding, Judge Sullivan responsibly invited counsel to offer his views on whether Smallwood’s challenges to the legality of the cy-prés provision should be heard by the District Court in the Keepseagle proceeding as a related case. Id. at 22, JA 1224. Counsel declined this invitation, stating that he was “completely satisfied with where the case sits at this particular point.” Id. at 70, JA-1272. Thereafter, counsel never raised, briefed, or otherwise pressed any legal challenges to the cy-prés provision in the Keepseagle proceeding, and the District Court did not further address it. In the separate case, Judge Walton granted the Department’s motion to dismiss for lack of standing on January 30, 2017. Smallwood v. Yates, No. 16-cv-161, — F.Supp.3d -, 2017 WL 398334 (D.D.C. Jan. 30, 2017). An appeal was filed in that case on April 12, 2017.
The District Court approved the proposed compromise modification on April 20, 2016. See Second Modification Decision, JA 1447-75. The District Court declined to construe the original Agreement’s modification clause “to require unanimous consent of the class representatives.” Id. at 19, JA 1465. The District Court also determined that the proposed modification was “fair, reasonable,' and adequate,” as required by Rule 23(e)(2). Id. at 19-27, JA 1465-73. Appellants Tingle and Mandan now appeal the District Court’s grant of class counsel’s motion to modify the settlement.
II. Analysis
A. Standard of Review
We review the District Court’s interpretation of the terms of the Settlement Agreement de novo. See Nix v. Billington, 448 F.3d 411, 414 (D.C. Cir. 2006). And we review the District Court’s approval of the modification to the Settlement Agreement for abuse of discretion. See Pigford v. Johanns, 416 F.3d 12, 16 (D.C. Cir. 2005).
B. The District Court’s Interpretation of the Modiñcation Provision
The District Court correctly interpreted the modification provision in the Agreement because a “reasonable person *1047 in the position of the parties” would not have thought that the provision requires unanimous approval by class representatives. See Richardson v. Edwards, 127 F.3d 97, 101 (D.C. Cir. 1997). The modification provision states that the Agreement “may be modified only with the written agreement of the Parties.” Settlement Agreement § XXII, JA 438. We find that “written agreement of the Parties” cannot reasonably be construed, as Appellant Mandan urges, to require the unanimous assent of class representatives.
‘We interpret a settlement agreement under contract law.” Gonzalez v. Dep’t of Labor, 609 F.3d 451, 457 (D.C. Cir. 2010) (citing T Street Dev., LLC v. Dereje & Dereje, 586 F.3d 6, 11 (D.C. Cir. 2009)). We must first “determine whether the disputed language is unambiguous.” Armenian Assembly of Am., Inc. v. Cafesjian, 758 F.3d 265, 278 (D.C. Cir. 2014). If we find that the relevant clause is subject to more than one reasonable interpretation, we consider “what a reasonable person in the position of the parties would have thought the disputed language meant.” Id. (quoting Tillery v. D.C. Contract Appeals Bd., 912 A.2d 1169, 1176 (D.C. 2006)).
We acknowledge that “the written agreement of the Parties” is ambiguous because “agreement” is reasonably susceptible to more than one construction. Nevertheless, in the context of this class action settlement, we do not believe that agreement means unanimous agreement, because such an interpretive gloss would yield absurd results. See United States v. Winstar Corp., 518 U.S. 839, 907, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (avoiding interpretation of contract that “would be absurd”); Am. First Inv. Corp. v. Goland, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (avoiding interpretation that would “produce an absurd result”).
The Agreement defines “Parties” as “the Plaintiffs and the Secretary,” and defines “the Plaintiffs” as “the individual plaintiffs named in Keepseagle v. Vilsack, ... the members of the Class, and the Class Representatives.” Settlement Agreement § II(DD), (EE), JA 396. The terms of the Agreement allow modification upon the written agreement of the individual plaintiffs named in Keepseagle v. Vilsack, the members of the Class, the Class Representatives, and the Secretary. Id. § XXII, JA 438. If “agreement” were construed to require unanimous assent, the Settlement Agreement could be modified only if every single class member—upwards of thousands of people—assented. There is no good reason to believe that the parties intended to impose such a stringent barrier to modification. The modification provision would become meaningless, which would make little sense. See Beal Mortg., Inc. v. FDIC, 132 F.3d 85, 88 (D.C. Cir. 1998) (describing “the cardinal interpretive principle that we read a contract to give meaning to all of its provisions” (citations and internal quotation marks omitted)). In order to avoid such an absurd construction and to give effect to the parties’ intentions, we reject the argument that “the agreement of the Parties” was meant to require unanimity.
Furthermore, a central interpretive goal “in construing a contract is to give effect to the mutual intentions of the parties.” NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985). To effectuate the parties’ intent, we must consider the “context.” Id. at 681 n.10. Here, it is noteworthy that the Agreement resolved a class action. “Class actions are a form of representative litigation. One or more class representatives litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative’s litigation.” William B. Ru- *1048 BENSTEIN, NEWBERG ON CLASS ACTIONS § 1:1 (5th ed. 2016). Various class action procedures protect class members from being taken advantage of by class representatives, including the requirement that class representatives “fairly and adequately protect the interests of the class,” Fed. R. Civ. P. 23(a)(4), and the requirement that a court ensure that any settlement is “fair, reasonable, and adequate,” Fed. R. Civ. P. 23(e)(2).
These structural protections for class members diminish the need for unanimous decisionmaking in a class action. Requiring unanimity among class members, apart from being virtually impossible to achieve in a case of this sort, also invites gamesmanship by giving any class member the power to “hold out” and threaten to veto to seek a payoff. See Elizabeth Chamblee Burch, Growp Consensus, Individual Consent, 79 Geo. Wash. L. Rev. 506, 508 (2011) (“The holdout problem arises when defendants condition settlement on nearly unanimous consent.... [A hold out] threatens to derail the entire deal unless those claimants receive a disproportionately high payoff.”). With these considerations in mind, we conclude that the modification provision, read in context—an Agreement resolving a representational proceeding— permits amendment of the Agreement without unanimous assent.
Finally, we can discern no good reason why the parties would require unanimity to modify the Settlement Agreement, when unanimity was not required to approve the settlement in the first instance. As we noted in Thomas v. Albright, 139 F.3d 227, 232 (D.C. Cir. 1998), “a settlement can be fair even though a significant portion of the class and some of the named plaintiffs object to it.” Indeed, in this case, the District Court approved the original settlement over the objections of thirty five class members. We doubt that the parties intended for modification to be more difficult than approval. Thus, the District Court correctly found that
[j]ust as it could not reasonably have been the intent of the parties to construe the modification provision to require the consent of all class members to any modification, it also could not reasonably have been the intent of the parties to construe the modification provision to require the unanimous consent of the class representatives.
Second Modification Decision at 19, JA 1465.
We are not persuaded by Appellant Mandan’s one argument to the contrary. He claims that the District Court was bound by its decision rejecting the first modification proposal because it was the “law of the case.” Br. for Mandan at 48. This claim is simply mistaken. The District Court’s initial decision was not binding because it was not embodied in any final judgment. “When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court.” LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (citation and internal quotation marks omitted). However, the law-of-the-case doctrine “does not apply to interlocutory orders ... for they can always be reconsidered and modified by a district court prior to entry of a final judgment.” First Union Nat’l Bank v. Pictet Overseas Tr. Corp., 477 F.3d 616, 620 (8th Cir. 2007) (citation omitted).
C. The District Court’s Fairness Determination
The District Court reasonably determined that the modified agreement was fair, reasonable, and adequate, Appellants have not met their “burden on appeal of making a ‘clear showing’ that an abuse of *1049 discretion has occurred” in the District Court’s approval of the modified settlement. Pigford v. Glickman, 206 F.3d 1212, 1217 (D.C. Cir. 2000) (quoting Moore v. Nat’l Ass’n of Sec. Dealers, 762 F.2d 1098, 1107 (D.C. Cir. 1985)).
The record reveals that the District Court conducted an impressive and thorough review of the proposed addendum. The District Court “directed class counsel to provide the class with notice of the proposed Addendum, allowed class members to submit written comments to the Court, and scheduled a hearing ... to hear argument from counsel and oral statements from class members.” Second Modification Decision at 11, JA 1457. During an eight-hour hearing in the ceremonial courtroom, which was used to accommodate the large number of class members present, the District Court heard testimony from over thirty class members. See JA 1203-1437 (transcript of hearing).
Following the hearing, the District Court concluded that the proposed addendum was a fair compromise. The addendum reformed the cy-pres distribution provisions, which all parties agreed were unworkable. The initial Settlement Agreement required an equal distribution of funds to a restricted class of non-profit organizations approved by class counsel; the addendum eliminated the equal distribution requirement and expanded the class of non-profits eligible for the funds. See Plaintiffs’ Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions at 6-8, Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Dec. 14, 2015), ECF No. 824. Most notably, the addendum placed the bulk of the cy-pres funds in a trust overseen by trustees with “substantial knowledge of agricultural issues, the needs of Native American farmers and ranchers, or other substantive knowledge relevant to accomplishing the Trust’s Mission.” Trust Agreement § 13(f)(1), Keepseagle v. Vilsack, No. 99-cv-3119 (D.D.C. Dec. 14, 2015), ECF No. 824-3. And, rather than distributing all of the funds at once, the addendum established a process for the trust to be paid out over 20 years. Id. § 10. As the District Court explained, these reforms, which offered greater flexibility and expertise in the management and distribution of funds, were necessary because of the “unexpectedly large amount of remaining funds.” Second Modification Decision at 25-26, JA 1471-72.
The addendum also reflected a compromise regarding additional payments to class members who recovered in the first claims process. The two contending groups—one favoring distribution of all remaining funds to successful claimants, and one favoring no additional distribution-conceded to a middle ground: a limited distribution to successful claimants. The compromise provided for an additional $18,500 payment to successful claimants as well as a direct payment to the Internal Revenue Service to cover tax liability. As the District Court recognized, “[wjhile the amount of the payment is not as high as the class representatives and many class members would prefer, it is an additional payment that was not contemplated in the existing Agreement.” Id. at 25, JA 1471.
As we have previously noted, “[a] claim that individual dissenters are entitled to more money is not, by itself, sufficient to reject the overall fairness of the settlement; ... a settlement necessitates compromise.” Thomas, 139 F.3d at 232. We have no good reason to second-guess the District Court’s conclusion that, in providing both supplemental payments and reforming the cy-pres process, the negotiated compromise fairly balances the parties’ competing positions.
Appellant Mandan raises several procedural challenges to the District Court’s fairness determination. He argues that the *1050 District Court erred by failing to recognize that it had the “equitable power” to distribute all of the funds marked for cy-pres beneficiaries to the prevailing claimants. Br. for Mandan at 32-35. In a related argument, Appellant Mandan claims that the District Court should not have approved the modified settlement “without first determining whether the prevailing claimants were readily identifiable and whether further distributions to them were economically viable.” Id. at 35 (capitalization altered). Appellant Mandan’s final procedural challenge is that the District Court did not provide a “reasoned explanation” for its approval of the modified settlement. Id. at 42. We find no merit in these claims.
First, the District Court was correct in finding that it was not authorized “to fashion a different resolution such as ordering that the remaining funds be paid to prevailing claimants,” Second Modification Decision at 24, JA 1470, because the District Court’s jurisdiction was limited to accepting or rejecting the proposed settlement agreement that was before it. “[Djistrict courts enjoy no free-ranging ‘ancillary’ jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order.” Pigford v. Veneman, 292 F.3d 918, 924 (D.C. Cir. 2002). In a previous decision in this ease, we said: “The District Court’s jurisdiction is drawn exceedingly narrowly....” Keepseagle v. Vilsack, 815 F.3d 28, 36 (D.C. Cir. 2016). We recognized that the Agreement grants ongoing jurisdiction to the District Court only for specifically delineated, and narrow, circumstances, none of which apply here. Settlement Agreement § XIII, JA 429-30. District courts do not have freewheeling jurisdiction to modify settlements. “Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree’s negotiated terms?” Pigford, 292 F.3d at 925.
Second, the District Court did not err in approving the addendum without determining whether the prevailing claimants were identifiable and whether paying out funds to them was feasible. As discussed above, this argument misconceives the role and authority of the District Court, which is very limited. Appellant Mandan’s argument also misreads our case law. There is no precedent in this circuit to support the assertion that parties cannot negotiate a settlement providing for cy-pres distribution where prevailing claimants are identifiable and dispersal of funds is feasible. In support of this claim, Appellant Mandan cites Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Commission, 84 F.3d 451 (D.C. Cir. 1996). However, the decision in that case did not limit cy-pres awards to situations where prevailing claimants are not easily identifiable. Rather, the decision merely stated a definition of cy-prés—“permitting] such funds to be distributed to the ‘next best’ class when the plaintiffs cannot be compensated individually”—that “some courts have applied.” Id. at 455. It does not limit cy-pres distributions to certain prescribed circum: stances.
The cases from other circuits cited by Appellant Mandan are inapposite. See Br. for Mandan at 38. Appellant Mandan primarily points to decisions in which district courts sua sponte made cy-pres awards, not cases (like the one here) in which the parties’ negotiated settlement agreement included a cy-pres provision. Indeed, in a decision from the Third Circuit, the court explained that “a district court does not abuse its discretion by approving a class action settlement agreement that includes a cy pres component directing the distribution of excess settlement funds to a third *1051 party.” In re Baby Prods. Antitrust Litig., 708 F.3d 163, 172 (3d Cir. 2013). That decision distinguished eases in which the parties “agreed to” the cy-pres distribution from cases in which trial courts imposed a cy-pres distribution “over the objections of the parties.” Id. at 172 n.7. This case falls in the former category because the Settlement Agreement includes a cy-pres provision. See Settlement Agreement § IX(F)(7), JA 422-23.
The other cases cited by Appellant Man-dan involving decisions from our sister circuits are also plainly distinguishable. See, e.g., In re Lupron Mktg. & Sales Practices Litig., 677 F.3d 21 (1st Cir. 2012) (agreement gave district court full discretion to select recipients of cypres fund); Nachshin v. AOL, LLC, 663 F.3d 1034 (9th Cir. 2011) (cy-pres beneficiaries were completely unrelated to the objectives of the class action); In re Katrina Canal Breaches Litig., 628 F.3d 185 (5th Cir. 2010) (agreement provided for appointment of special master to dispose of any remaining funds without any guidelines). All of these cases involved situations that are very different from this case.
Finally, Appellant Mandan’s argument that the District Court failed to give a reasoned explanation for its acceptance of the addendum is belied by the record. As discussed above, throughout the extensive settlement process that was supervised by the District Court, as well as in its opinion disposing of this case, the court showed admirable patience, fairness, and good judgment in weighing the competing proposals for modification. See Second Modification Decision at 25-27, JA 1471-73 (explaining the court’s reasoning). We not only do not reverse the District Court, we applaud its good efforts in bringing this case to conclusion.
D. The Waived and Forfeited Claims Relating to the Appropriations Clause and the Judgment Fund Act
The lawsuit in this case was filed in 1999. The parties reached settlement in 2010. The District Court approved the settlement in 2011. No appeal was taken by any party. And at no time during this twelve-year period did any party challenge the legality of the cy-pres provision in the Agreement.
The initial Agreement contained a cy-pres clause providing that “the Claims Administrator shall direct áhy leftovers funds to the Cy Pres Fund.” Settlement Agreement § IX(F)(7), JA 422-23. Neither Appellant Mandan nor any other interested party objected to this provision. Quite the contrary, Appellant Mandan accepted the settlement and received a payout from the administrative claims process. See Comments of Class Representative Keith Man-dan at 1 (Jan. 20, 2016), JA 1197 (“Keith Mandan, is- both a Class Representative and a Prevailing Claimant....”).
Appellant Mandan (and other parties) had a second opportunity to challenge the legality of the cy-pres provision in the Agreement during the first proceedings to modify the Agreement. At this point in the litigation, the claims process had concluded, leaving $380 million remaining to be directed to the cy-pres fund. The issue regarding the distribution of funds pursuant to the cy-pres provision was front-and-center at this stage of the proceedings before the District Court. Yet, neither Appellant Mandan nor any other interested party raised any objection to the legality of the cy-pres provision in the Agreement.
Appellant Mandan’s third opportunity to challenge the legality of the cy-pres provision came when the District Court considered the second proposal to modify the Agreement. Appellant Mandan contested the cy-pres distribution, but he did not *1052 contest the legality of the cy-pres provision. See Comments of Class Representative Keith Mandan at 3 (Jan. 20, 2016), JA 1199. Appellant Mandan’s counsel clearly knew during the second modification proceeding that he could raise any constitutional or legal challenges to the cy-prés provision. He knew because he explicitly declined to pursue any such challenges.
In February 2016, a few days before the District Court’s fairness hearing concerning the second proposed modification, counsel for Appellant Mandan filed a new, separate lawsuit, on behalf of a different class member, challenging the legality of the cy-pres provision. See Complaint, Smallwood v. Lynch, No. 16-cv-161 (D.D.C. Feb. 1, 2016), ECF No. 1. In that complaint, counsel for Appellant Mandan marked the case as related to the Keepsea-gle case, but the District Court determined that it did “not appear to be related within the meaning of our local rules.” Tr. of Mot. Hr’g Proceedings at 22, JA 1224. However, at the February 2016 fairness hearing, Judge Sullivan, who was presiding over the Keepseagle proceeding, offered counsel for Appellant Mandan the opportunity to present his challenges to the legality of the cy-prés provision. The District Court told counsel that the case “was reassigned to one of my colleagues, Judge Walton. He and I have not discussed this, and maybe I should have heard from counsel first as to whether the Court should keep the case and resolve it itself or not. I’m interested in your views about that.” Id. But Appellant Mandan’s counsel refused Judge Sullivan’s invitation to raise the issue and explicitly declined to present his argument to the District Court, stating that “we are completely satisfied with where the case sits at this particular point.” Id. at 70, JA 1272. Judge Sullivan then told counsel that the case is “before Judge Walton, and so you can make your arguments to him.” Id. at 71, JA 1273.
Counsel for Appellant Mandan thereafter argued before Judge Walton in the separate case challenging the legality of the cy-pres provision. Judge Walton dismissed the complaint for lack of standing on January 30, 2017. See Smallwood v. Yates, No. 16-cv-161, -— F.Supp.3d -, 2017 WL 398334 (D.D.C. Jan. 30, 2017). The matter was never raised again in conjunction with the Keepseagle case until Appellant Mandan filed his appeal with this court. Judge Sullivan never had occasion to address the issue because Appellant Mandan’s counsel explicitly declined to pursue the matter in this case. This procedural history, which Appellant Man-dan did not mention in his briefs to this court, reveals that he knowingly declined to raise his claims with the District Court in the matter now under review in this court.
Appellant Mandan now advances, for the first time in this case, constitutional and statutory challenges to the Settlement Agreement’s cy-pres provision. He argues that the provision violates the Appropriations Clause, U.S. Const, art. I, § 9, cl. 7, because it proposes to expend Treasury funds without a specific appropriation by Congress. Br. for Mandan at 21-32. And he contends that the provision violates the Judgment Fund Act, 31 U.S.C. § 1304(a)(3), because cy-pres beneficiaries are “uninjured non-parties” who would not be able to recover judgments against the United States. Br. for Mandan at 26. In Appellant Mandan’s view, these claims are inexorably tied together and they are presented together in his brief. See, e.g., id. at 19. As noted, above, these claims were never raised with the District Court. We therefore decline to review the claims because they were waived or forfeited.
In Greenlaw v. United States, 554 U.S. 237, 243-44, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008), the Supreme Court explained *1053 why appellate courts should be loath to address issues that were not raised with the district court in the first instance:
In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a pro se litigant’s rights. See Castro v. United States, 540 U.S. 375, 381-383 [124 S.Ct. 786, 157 L.Ed.2d 778] (2003). But as a general rule, “[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.” Id., at 386 [124 S.Ct. 786]. (SCALIA, J., concurring in part and concurring in judgment). As cogently explained:
“[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do.... ” United States v. Samuels, 808 F.2d 1298, 1301 (C.A.8 1987) (R. Arnold, J., concurring in denial of reh’g en banc).
554 U.S. at 243-44, 128 S.Ct. 2559.
“Although jurists often use the words interchangeably,” Kontrick v. Ryan, 540 U.S. 443, 458 n.13, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004), loaiver is the “intentional relinquishment or abandonment of a known right,” United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (citation and internal quotation marks omitted), and “forfeiture is the failure to make the timely assertion of a right.” Id. In this case, Appellant Mandan waived his claims and he forfeited any right that he might have had to raise the matters on appeal. Application of the waiver doctrine, alone, is sufficient to dispose of these issues.
Appellant Mandan explicitly waived his claims when his counsel told the District Court Judge that he did not wish to pursue any challenges to the cy-pres provision. He did this after Judge Sullivan invited him to raise whatever concerns he had. “[A]fter expressing [a] clear and accurate understanding of the ... issue, [Counsel] deliberately steered the District Court away from the question.... In short, [Counsel] ... chose, in no uncertain terms, to refrain from interposing [any] ‘challenge’ [to the cy-pres provision].” Wood v. Milyard, 566 U.S. 463, 132 S.Ct. 1826, 1835, 182 L.Ed.2d 733 (2012). In these circumstances, Appellant Mandan’s claims regarding the legality of the cy-pres provision were waived and they cannot be raised on appeal.
On the record before us, there is no doubt that Appellant Mandan waived his claims regarding the legality of the cy-pres provision. Even if we take a different tack and consider whether Appellant Man-dan forfeited (rather than waived) his claims, the result is the same. The case law is clear that he is foreclosed from belatedly challenging the legality of the cy-pres provision for the first time on appeal because he never raised his claims with the District Court in the first instance.
“It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.” District of Columbia v. Air Florida, Inc., 750 F.2d 1077, 1084 (D.C. Cir. 1984). We have explained the reasons for this general principle: “Enormous confu *1054 sion and interminable delay would result if counsel were permitted to appeal upon points not presented to the court below. Almost every case would in effect be tried twice under any such practice. While the rule may work hardship in individual cases, it is necessary that its integrity be preserved.” Id. at 1084-85 (quoting Johnston v. Reily, 160 F.2d 249, 250 (D.C. Cir. 1947)).
Thus, under well-established law, a party forfeits a claim by failing to raise it below when the party “knew, or should have known” that the claim could be raised. Laffey v. Nw. Airlines, Inc., 740 F.2d 1071, 1091 (D.C. Cir.. 1984). In this case, Appellant Mandan knew, or should have known, that his constitutional and statutory claims could have been raised in 2011, when the District Court approved the Settlement Agreement containing the cy-pres provision. Appellant Mandan does not dispute this.
By 2015, after the claims process concluded and the remaining funds were slated for cy-pres distribution, there can be no doubt that Appellant Mandan was once again on notice of the opportunity to put forward his constitutional and statutory theories. As detailed above, during the February 2016 fairness hearing, Judge Sullivan offered counsel for Appellant Mandan the opportunity to present his legal challenges to the cy-pres provision. Counsel expressly declined and thereafter never pursued the claims with the District Court in this case.
In light of this record, it would be extraordinary for an appellate court to address these claims for the first time on appeal. As the Supreme Court said in Greenlaw, in “our adversary system ... we follow the principle of party presentation .... [Appellate courts] should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.” 554 U.S. at 243-44, 128 S.Ct. 2559 (citation and internal quotation marks omitted).
It does not matter that Appellant Mandan’s belated claims involve constitutional issues. The doctrines of waiver and forfeiture apply to constitutional objections. See Curtis Pub. Co. v. Butts, 388 U.S. 130, 143, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (“[I]t is ... clear that even constitutional objections may be waived by a failure to raise them at a proper time.... ” (citing Michel v. Louisiana, 350 U.S. 91, 99, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); see also Eli Lilly & Co. v. Home Ins. Co., 794 F.2d 710, 717 (D.C. Cir. 1986) (finding that “appellants waived their constitutional claims by failing to raise them on their initial appeal to this court”); Ya-kus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944); (“No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.”).
We would not only pervert the adversary process by addressing Appellant Mandan’s newly raised claims, we would also be required to engage in unduly weighty and cumbersome decision-making without a decent record from the District Court. See Air Florida, Inc., 750 F.2d at 1085 (pointing out the “serious problems” that would be encountered if the court entertained complex issues on appeal “without prior consideration by the trial court”).
Appellant Mandan’s theories are novel and they rest on his view of legislative history that is beyond the record of this case. See Br. for Mandan at 26-29 (citing, e.g., Proposal to Expedite the Payment of Judgments against the United States: Hearing Before the Subcomm. of the *1055 Comm, on Appropriations, 84th Cong. 883 (1956)). While some of Appellees’ briefs touch on the merits of some of Appellant Mandan’s claims, see, e.g., Br. for Appellee Vilsack at 19-24, we lack the robust record necessary to properly evaluate the substance of these arguments. Indeed, as far as we can discern, Appellant Mandan’s arguments have never been addressed by any federal appellate court, and they have been explored only tangentially in a single law review article. See Paul F. Figley, The Judgment Fund: America’s Deepest Pocket and its Susceptibility to Executive Branch Misuse, 18 U. Pa. J. Const. L. 145, 194-97 (2015).
Even giving Appellant Mandan the benefit of the doubt, we certainly cannot say that “the proper resolution [of his claims] is beyond any doubt.” Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). If anything, his arguments regarding the Judgment Fund Act appear to be misguided. See Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 103 (1989) (focusing on the “underlying cause” leading to settlement, and not on the identity of the parties receiving settlement funds (citation omitted)).
Indeed, it is noteworthy that Appellant Mandan’s arguments regarding the Judgment Fund Act stem principally from his policy concerns over the use of cy-pres provisions, and not from any clear statutory mandate. See, e.g., Br. for Mandan at 28-29 (“Cy pres is a troublesome concept generally.”). “This being so, injustice [is] more likely to be caused than avoided” if this court were to address the issues in the first instance before they have been properly raised and tried in the District Court. Singleton, 428 U.S. at 121, 96 S.Ct. 2868.
Given the novelty and complexity of Appellant Mandan’s claims, the materials that he asks us to review, and the policy arguments that he raises, it would be entirely inappropriate for this court to address the merits of his claims without the benefit of a full record, including a decision from the District Court in the first instance. As then-judge Scalia explained,
[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.... Failure to enforce this requirement will ultimately deprive us in substantial measure of that assistance of counsel which the system assumes—a deficiency that we can perhaps supply by other means, but not without altering the character of our institution.
Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983); see also Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941) (“[It] is essential ... that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide.... ”). Departing from our established “principle of party presentation” would deprive the parties of a full opportunity to present their arguments and would place this court in the unsuitable position of deciding novel legal issues in the first instance. This is not our role.
We understand that, in “exceptional circumstances,” an appellate court may exercise discretion to address an i,ssue that is subject to forfeiture. Roosevelt v. E.I. Du Pont de Nemours & Co., 958 F.2d 416, 419 n.5 (D.C. Cir. 1992). The Supreme Court said as much in Singleton, 428 U.S. at 121, 96 S.Ct. 2868. But the Court made it clear that this is the exception, not the rule, and it should be limited to situations “as where the proper resolution is beyond any doubt,” or where “injustice might otherwise result.” Id. (citation omitted). The record in this case does not come close to *1056 establishing exceptional circumstances that would militate in favor of this court considering, in the first instance, Appellant’s legal challenges to the cy-pres provision.
The truth here is that the “exceptional circumstances” exception to forfeiture is of little moment in this case because, before the District Court, Appellant Mandan explicitly waived the claims that he now seeks to raise with this court. And contrary to what the dissent implies, there is no authority to support a suggestion that Appellant Mandan’s Appropriations Clause claims raise an Article III concern or call into question the jurisdiction of this court. The simple point here is that Appellant Mandan’s Appropriations Clause claims were waived before the District Court and that is the end of the matter.
E. Appellant Tingle’s Arguments
Appellant Tingle’s arguments overlap significantly with Appellant Man-dan’s, and are unpersuasive for the reasons discussed above. However, Appellant Tingle raises two unique arguments: first, that “[c]lass counsel had a conflict of interest and breached its fiduciary duty,” Br. for Tingle at 30; and, second, that “[t]he class representatives breached their fiduciary duties,” id. at 35. We reject both claims because Appellant Tingle offers no evidence in support of his allegations. He asserts that “divergent interests emerged within the class” such that class counsel “was simultaneously representing clients with conflicting interests.” Id. at 31. He does not explain what those divergent interests were and how they resulted in breaches of fiduciary duties. Class representatives often must weigh competing claims in weighing the best interests of the class as a whole. This, without more, does not give evidence of a breach of fiduciary duties. Likewise, Appellant Tingle alleges that trusteeships overseeing the proposed trust were promised to certain class representatives “to incentivize a change in position.” Id. at • 36. Nothing in the record supports this accusation. Lastly, Appellant Tingle takes aim at the “incentive fees” (or service awards) provided by the Agreement for the class representatives’ work in negotiating the Agreement and its modification. Id. at 37. However, “incentive awards have often been used to compensate a class representative,” Cobell v. Jewell, 802 F.Sd 12, 25 (D.C. Cir. 2015), and nothing in the record of this case suggests that the service awards served any nefarious purposes.
III. Conclusion
For the reasons set forth above, we affirm the judgment of the District Court.